No. 25-1244

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

———————————————

State of California, *et al.*,

*Plaintiffs-Appellees,*

v.

U.S. Department of Education, *et al.*,

*Defendants-Appellants.*

———————————————

On Appeal from the United States District Court
for the District of Massachusetts

———————————————

## EMERGENCY MOTION FOR STAY PENDING APPEAL AND
## IMMEDIATE ADMINISTRATIVE STAY

———————————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

LEAH B. FOLEY
  *United States Attorney*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

## INTRODUCTION

Under the guise of a "temporary restraining order" issued weeks after the challenged action but days after plaintiffs filed suit, the district court ordered the government to make available within 24 hours money from grants that the Department of Education lawfully terminated. Immediate relief is required to avoid irreparable harm to the government from the imminent drawing-down of these funds, which will be spent on grants that the Department permissibly determined were contrary to the government's interests.

Perhaps due to the haste with which it was issued, the court's order is riddled with factual and legal errors. The court did not analyze any grant terms or any regulations, but instead reasoned that plaintiffs were likely to succeed on their claim that the terminations were "arbitrary and capricious" across-the-board under the APA because the use of template termination letters suggested no "individualized" analysis had been performed.

As a threshold matter, the district court's jurisdictional analysis was fundamentally flawed. The court stated that the claims were not contract claims over which a district court lacks jurisdiction because the case involves federal statutes and regulations, but the only statute on which the district court relied was the APA itself. The court also treated grant decisions as subject to arbitrary-and-capricious review despite longstanding precedent holding that funding decisions are committed to agency discretion by law.

On the facts, the district court made a record-based determination without waiting to obtain or review the record, thus erroneously concluding that the agency made a categorical decision when the terminations in fact followed from a multi-step, individualized process. Regardless, nothing in the APA requires "individualized" as opposed to categorical policy choices about what projects the government will fund.

Emergency relief is warranted because the court's injunction means that $65 million dollars will be available for immediate draw-down by the grantees at their request. Grantees may request funds at any time and receive those funds within days. And they have every incentive to rapidly draw down these funds while the district court's order remains. Once the funds are drawn down, the government has no ready mechanism for their recovery. That outweighs the recipients' interest in receiving the money within the next 14 days, particularly where they waited longer than that to file this lawsuit. The district court dismissed the government's interest on the theory that Congress had appropriated funds for these purposes—but Congress did not specify *these specific grants* in its appropriation. That is a core matter of executive discretion, and a single district judge has now usurped the power to set education policy priorities.

In light of these exigencies, the government requests an immediate administrative stay of the order below or, absent that, a decision on the stay motion by **5 PM on Thursday, March 13.** The government requests this urgent ruling to facilitate review by the Supreme Court, if necessary. Plaintiffs oppose this motion.

# STATEMENT

1. This case involves two grant programs implemented by the Department of Education pursuant to broad grants of authority by Congress. The first, known as the Teacher Quality Partnership ("TQP"), provides that "the Secretary is authorized to award grants, on a competitive basis, to eligible partnerships, to enable the eligible partnerships to carry out" certain activities, including "a program for the preparation of teachers," a "teaching residency program," and "a leadership development program." 20 U.S.C. § 1022a(a), (c). The second, known as the Supporting Effective Educator Development ("SEED"), generally directs the Secretary to "award grants, on a competitive basis, to eligible entities for" five specified "purposes," such as "providing evidence-based professional development activities" and "making freely available services and learning opportunity to local education agencies." 20 U.S.C. § 6672(a).

The government had selected grantees and made funding available, which grantees may draw down over the course of the fiscal year. App.17. On February 5, 2025, the Acting Secretary of Education issued a Directive on Department Grant Priorities, which contemplated an internal review to ensure that grants do not fund "discriminatory practices—including in the form of [diversity, equity, and inclusion ('DEI')]—that are either contrary to law or to the Department's policy objectives, as well as to ensure that all grants are free from fraud, abuse, and duplication." App.14. In a multi-step process involving seven personnel over a week, the Department

3

accordingly reviewed each TQP and SEED grant individually and ultimately concluded, after consulting each grant document and available information about the funded program, that 104 grants should be terminated. App.16. Five grants remained in place. *Id.*

For each terminated grant, the Department issued a letter stating that the funded programs "promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic;" "violate either the letter or purpose of Federal civil rights law;" "conflict with the Department's policy of prioritizing merit, fairness, and excellence in education;" "are not free from fraud, abuse, or duplication;" or "otherwise fail to serve the best interests of the United States." App.16. Citing both "the termination provisions in" the grants and the Department's authority under "2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253," the letters terminated recipients' grants. *Id.*

2. On March 6, 2025, eight plaintiff States filed this suit. That same day—nearly a month after the terminations—plaintiffs moved for a temporary restraining order, Dkt. No. 2. Plaintiffs allege that the Department unlawfully terminated grants in violation of the APA. The Court did not invite defendants to submit a response but instead set a hearing for March 10 and granted relief that day.

The district court first reasoned that it had jurisdiction to entertain this action, notwithstanding the Court of Federal Claims' exclusive jurisdiction over certain contract claims, because "the source of the plaintiffs' rights was in federal statute and

regulations and because the relief was injunctive in nature." App.2. Turning to the merits, the court concluded that "there was no individualized analysis of any of the programs; rather, it appears that *all* TQP and SEED grants were simply terminated." App.4. The court also observed that each terminated program received the same termination letter, and concluded that the letter lacked any reasoned explanation specific to the individual grants. App.4-5. The court further faulted the Department's explanation because the Department had changed its policies since the grants awards were first authorized. App.6. The court did not resolve plaintiffs' other claims. App.6 n.3.

The district court concluded that plaintiffs had irreparable harm based on the cessation of funding that allegedly required the cancellation of certain programs. App.6-8. And the court concluded that the only harm to the government would be that the government would be required to disburse appropriated funds. App.9.

The court ordered the government to undo the termination of TQP or SEED grants for recipients in the plaintiff States; prohibited the government from implementing or reinstating those terminations; and prohibited the government from terminating any individual TQP or SEED grant in the plaintiff States "except to the extent the final agency action is consistent with the Congressional authorization and appropriations, relevant federal statute, including the requirements of the APA, the requirements of the relevant implementing regulations, the grant terms and conditions, and this Court's order." App.9-10. The court ordered the government to

5

provide notice of the order to all Department employees and all TQP and SEED grantees within 24 hours, and to file a status report within 24 hours confirming compliance. App.10.

The government noticed an appeal and filed a motion for a stay pending appeal, accompanied by a declaration explaining the relevant facts (since the district court ruled before the government made any substantive filing). The government will promptly notify this Court if the district court rules on the stay motion. Absent relief from the district court or this Court, the government intends to seek emergency relief in the Supreme Court.

## ARGUMENT

A stay pending appeal is warranted. The government is likely to succeed on the merits of its appeal, the government will face irreparable injury absent a stay, and the balance of equities and public interest support a stay. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

### A.    The District Court's Order Is Appealable

In the unique circumstances of this case, the district court's order is immediately appealable under 28 U.S.C. § 1292(a)(1) despite being labeled, in parts, a temporary restraining order. *But see* App.9-10 ( "temporarily enjoining"—not merely restraining—defendants). "[A]n order [that] has the 'practical effect' of granting or denying an injunction" "should be treated as such for purposes of appellate jurisdiction." *Abbott v. Perez*, 585 U.S. 579, 594 (2018); *see Fryzel v. Mortgage Elec.*

*Registration Sys., Inc.*, 719 F.3d 40, 43 (1st Cir. 2013) ("The nature of an order is the product of its operative terms and effect, not its vocabulary and label."). This Court has explained that, in addition to an order's practical effects, the order's duration and the existence of adversarial presentation inform whether an order is subject to immediate appeal. *See Calvary Chapel of Bangor v. Mills*, 984 F.3d 21, 27 (1st Cir. 2020); *San Francisco Real Estate Investors v. Real Estate Investment Trust of Am.*, 692 F.2d 814, 816 (1st Cir. 1982).

Here, the order's practical effect is profound. The court directed the government to take immediate steps to make available federal grant funds totaling tens of millions of dollars, which can be drawn down at will. App.16-17. The recipients can empty a substantial portion, if not the entire, balances of their accounts at any time. *Id.* The order thus effectively provides the States with "some or all of the relief" that they ultimately seek in the litigation. *Fryzel*, 719 F.3d at 43. And requiring the government to release federal funds that would be difficult to retrieve constitutes precisely the sort of "serious, perhaps irreparable consequences that [the government] can effectually challenge only by an immediate appeal." *Carson v. American Brands, Inc.*, 450 U.S. 79, 90 (1981) (quotations omitted).

This case also exemplifies the concern that the Supreme Court expressed about the need for limits on unappealable temporary restraining orders. Plaintiffs' conduct appears designed to manufacture an emergency and "shield" the district court's order "from appellate review." *Sampson v. Murray*, 415 U.S. 61, 86-87 (1974). The Department

issued its grant terminations a month ago. App.16. Yet plaintiffs, without any meaningful explanation, waited until March 6 to institute these proceedings. Plaintiffs cannot engineer a need for urgent relief and then evade appellate review while they draw down money in the meantime.

Particularly given this context, the extent of adversarial presentation provides a further basis for treating the order as a preliminary injunction. Where, as here, "an adversary hearing has been held, and the court's basis for issuing the order strongly challenged, classification of the potentially unlimited order as a temporary restraining order seems particularly unjustified." *Sampson*, 415 U.S. at 87. Although the district court did not await briefing from the government, the district court's decision to conduct adversarial proceedings orally in light of the plaintiff-induced urgency provides no basis for shielding the resulting order from appellate review.

Nor can plaintiffs rely on the order's 14-day duration to defeat appellate jurisdiction. Plaintiffs have already requested a 14-day extension based on a perfunctory assertion about "the complexity of the issues" and "the number of parties." Dkt. No. 47, at 2-3. In any event, limiting the order's duration does little to address its practical effects because, as noted, recipients can draw down the remaining $65 million immediately and have every incentive to do so.

If this Court were to conclude that the order is unappealable, the Court should exercise its discretion to treat this motion as a petition for writ of mandamus. *In re Providence J. Co., Inc.*, 293 F.3d 1, 9 (1st Cir. 2002). The district court's extraordinary

order readily satisfies the standard to grant mandamus. *See Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380-81 (2004).

**B.    The Government Is Likely to Prevail on the Merits**

The district court's conclusion that the Department's terminations were insufficiently explained has no sound legal footing. The district court's analysis of whether plaintiffs' suit is properly brought in district court failed to grapple with the relevant principles. The district court improperly subjected the Department's termination decisions to arbitrary-and-capricious review. And even on their own terms, the district court's merits conclusions are unpersuasive.

1. At the threshold, the district court's jurisdictional analysis was fundamentally flawed. As a general rule, the federal government is "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). And although the APA provides "a limited waiver of sovereign immunity for claims against the United States" seeking non-monetary relief, *id.*, that waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). (quotation omitted). That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.*

In particular, when a party seeks to access funding that it believes the government is obligated to pay under a contract or grant, the proper remedy is

typically suit under the Tucker Act, not the APA. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a). As the D.C. Circuit has explained, "the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court." *Albrecht v. Committee on Employee Benefits of the Federal Reserve Employee Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted). And the Tucker Act's preclusive effect extends to some claims founded on grants. To the extent that the government has implemented its grant programs by "employ[ing] contracts to set the terms of and receive commitments from recipients," then the proper recourse for asserted violations of those grant terms is likely a "suit in the Claims Court for damages relating to an alleged breach." *Boaz Housing Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021).

In determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act or instead a challenge properly brought under the APA, courts have looked at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted); *see also, e.g.*, *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 403 (2d Cir. 2017) (applying *Megapulse* test); *American Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978) (evaluating whether "the essence of the action is in contract").

The district court made no effort to apply these principles. And those principles strongly cut against the district court's conclusion. In many respects, this action, at bottom, is a contract dispute: The States claim grantees are entitled to funds under certain grant instruments, and they allege (among other things) that "the terms and conditions of the TQP and SEED grant awards do not authorize termination on the grounds" cited by the Department. Dkt. No. 1, at 5; *see also, e.g.*, *id.* at 50-51. While the States raise other issues too, that central contention is essentially a contract dispute—*i.e.*, whether these grants were properly cancelled. Moreover, although plaintiffs describe the remedies that they seek as APA remedies, *id.* at 51-52, those remedies also sound in contract, because they would effectively provide monetary relief. The order under review, for example, requires the government to make additional funds under plaintiffs' grants available for grantees to draw down.

In nonetheless concluding that it had jurisdiction over plaintiffs' suit, the district court simply "adopt[ed]" the reasoning recently employed in a different district court opinion addressing a challenge to a National Institutes of Health action. App.2. And the court asserted, without additional elaboration, that this suit "does not hinge on the terms of a contract between the parties, but rather federal statutes and regulations." App.3 (quotation omitted).

That reasoning is unpersuasive. Although the court claimed that this suit hinges on federal statutes and regulations, it cited nothing beyond the APA itself. *See* App.4-6. But the relevant question is whether plaintiffs' claims may proceed under the APA or

11

must instead be brought under the Tucker Act. In resolving that question, the court cannot rely on plaintiffs' circular assertion that the suit hinges on the APA's requirements, an argument that could apply in every case.

Nor is the district court's adoption of the reasoning in *National Institutes of Health* persuasive. There, the government had negotiated individualized "indirect cost rates" with institutions, and then issued a notice that, in the court's view, "eliminate[d]" those "individually negotiated rates" to instead "impose a flat rate of 15% across all grants." *Massachusetts v. National Insts. of Health*, No. 25-cv-10338, 2025 WL 702163, at *3 (D. Mass. Mar. 5, 2025). The district court determined that the plaintiffs' claims were founded on "the governing federal statute and regulations" rather than on their individual grants. *Id.* at *6. Even assuming that analysis was correct, it is inapposite here. For one, plaintiffs seek to challenge many individual grant terminations—including on the ground that the terminations did not comport with the terms of each grant—rather than a single agency policy. For another, as noted, the district court placed no reliance whatsoever on the governing federal statute and regulations.

2. The district court magnified its error by subjecting the Department's grant-termination decision to arbitrary-and-capricious review. The Department's determinations in that regard are committed to agency discretion by law.

In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to

instead reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA's reasoned-decisionmaking standards. *See id.* at 185-88. The Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192.

Thus, "an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Id.* at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).

"Of course," the Court went on, this discretion is not unbounded because "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." 508 U.S. at 193. But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude." *Id.*

Although *Lincoln* addressed lump-sum appropriations, courts have made clear that its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions—like decisions regarding how best to allocate lump-sum appropriations—"clearly require[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* at 752 (quotation omitted); *see also Policy & Research, LLC v. U.S. Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 75-76 (D.D.C. 2018).

The programs at issue here are just such programs: they provide significant discretion in determining how best to allocate appropriated funds across grant applicants. The statute governing TQP grants provides simply that "the Secretary is authorized to award grants, on a competitive basis, to eligible partnerships, to enable the eligible partnerships to carry out" certain activities, including "a program for the preparation of teachers," a "teaching residency program," and "a leadership development program." 20 U.S.C. § 1022a(a), (c). Similarly, the SEED grant statute generally directs the Secretary to "award grants, on a competitive basis, to eligible entities for" five specified "purposes," such as "providing evidence-based professional development activities" and "making freely available services and learning opportunity to local educational agencies." 20 U.S.C. § 6672(a).

Neither statute constrains the Secretary's discretion to determine how best to allocate the funding for each program among many different potential grant

recipients. As a result, the Secretary's decision to award or terminate a grant is reviewable—at most—only for compliance with the terms of the governing statutes, regulations, and funding instruments. The district court erred in subjecting the terminations to arbitrary-and-capricious review.

3.  In any event, the district court misapplied the arbitrary-and-capricious standard. That "standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Id.*

The Department's termination decisions plainly met that standard. As explained, those terminations came after the Department conducted an individualized review pursuant to the Acting Secretary's directive to identify grants that fund DEI programs that are contrary to the Department's policy priorities. The Department confirmed that specific grants in fact funded such programs and terminated those grants on that basis. *See supra* pp. 3-4; App.14-16. Particularly in the context of discretionary grants, where the Secretary unquestionably enjoys wide latitude to determine how best to implement the program, that decisionmaking process was both reasonable and reasonably explained.

In nonetheless concluding that the Department's actions violated the APA's standard, the court looked only at the termination letters and held that the letters themselves did not contain a "reasoned explanation." App.4-5. The court emphasized

that the letters listed several possible "bases for the grant termination" but did not "identify which" basis applied to each termination; that the court did not perceive there to be any "individualized analysis" with respect to whether to terminate each grant; and that the letters did not "conside[r] the facts and circumstances underlying the prior policy" under which "the grant awards had been authorized." App.4-6.

That analysis suffered from multiple flaws. First, the district court faulted the Department for sending template letters and for not engaging in any "individualized analysis." App.4-5. But the Department in fact engaged in individualized review—a fact the district court did not appreciate because it ruled before the government had filed any substantive papers. The court was also mistaken that the government terminated all of the grants. *See* App.16. And because the Department identified grants with a common characteristic (funding DEI) and terminated the grants on that basis, the Department reasonably provided a common explanation to grantees.

Moreover, the district court erred in concluding that the termination letters themselves failed to provide a sufficient explanation. Particularly in light of the Acting Secretary's directive and the review described above, the termination letters provide more than enough information such that the Department's "path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 286, (1974). But regardless, the court cited no authority for the proposition that such a letter—rather than the underlying record—must provide the full explanation required. And indeed, the district court's criticism of the Department's letters rings especially

hollow because the court entered its order without waiting for the Department to file a written response to plaintiffs' motion or otherwise explain the process it employed. It was unreasonable for the district court to refuse to wait for an explanation, not request the administrative record, and then fault the Department for failing to explain.

Finally, the district court was incorrect to fault the Department for its change in views on the merits of these grants. As explained, the Acting Secretary issued a directive reflecting the new Administration's policy priority that funding programs involving DEI is not in the Department's interests. Of course, the Administration may make that policy determination. And once made, that determination may lawfully drive grant-termination decisions. The Department's review of grants based on the "Administration's priorities" was regular and lawful. *See Department of Commerce v. New York*, 588 U.S. 752, 781 (2019). And because the Department's priorities are matters of policy discretion and not of "factual findings," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), a shift in those priorities does not require any additional explanation under the APA.

## C.     The Equitable Factors Favor a Stay Pending Appeal

The balance of equities and the public interest favor a stay pending appeal. *See Nken*, 556 U.S. at 435 (noting that these factors merge in cases involving the government). Plaintiffs have no cognizable interest in receiving federal funds to which they are not legally entitled or on a timeline that is not legally compelled. The district

court largely overlooked that plaintiffs' claimed harms are monetary and that, if plaintiffs ultimately prevail, they will receive the funds to the extent required by law. Plaintiffs' unexplained delay in bringing suit and seeking relief further "detracts from [their] claim of irreparable harm." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004). As explained above, plaintiffs did not challenge their grant terminations for nearly a month. Their newfound assertion that an immediate restoration of funding is necessary cannot be reconciled with their lack of urgency.

On the other hand, if recipients in the plaintiff States are given access to the funds, nothing prevents them from drawing down the funds. A total of $65 million remains outstanding under the relevant grant awards. App.16. As the agency has explained, there are generally "no internal checks or corroboration" and "only limited safeguards against early withdrawals" when grantees decide to draw funds from their accounts. App.17. Absent a stay, the Department believes "there is a significant risk of grantees attempting to withdraw tens of millions of dollars on canceled grants." *Id.* Neither the plaintiff States nor the various recipients in those States who are covered by the court's order have committed to "refrain from attempting large withdrawals that deplete most or all of the remaining grant funds." *Id.*

The government, on the other hand, faces imminent irreparable harm. According to the Department, "[o]nce funds leave the Department and go to grantees, the Department has limited ability to recover those disbursed funds." App.17. These risks are exacerbated because no grantee has "promised to return

withdrawn funds should its grant termination be reinstated." *Id.* Thus, by virtue of the district court's order, the recipients in the plaintiff States have the incentive to draw down and spend as much of the remaining $65 million as quickly as possible. *See id.* That perverse consequence reinforces the impropriety of the district court's remedy. Indeed, there are significantly less onerous options to preserve the status quo, such as an order to hold the funds without re-obligating them to other uses pending the outcome of the litigation.

The district court's order obstructs the Executive Branch's authority and ability to superintend federal dollars. The court's order compelling reinstatement of tens of millions of dollars in funds to recipients in the plaintiff States interferes with the lawful policy objectives and prerogatives of the Executive Branch. Although the court suggested that the government would suffer no harm because the order merely requires spending money appropriated by Congress, *see* App.9, the court ignored the Department's broad discretion within the programs to make allocation decisions. By depriving publicly accountable executive officials of those choices, the court intruded on a core executive function.

### D. The District Court's Order Is Overbroad

Even accepting the district court's conclusions, the district court's order—which applies to all grant recipients in the plaintiff States and which prohibits the Department from reinstating any covered termination—is overbroad in two respects. It thus must at least be stayed in part pending appeal.

19

First, the district court improperly extended relief to all grant recipients in the plaintiff States, rather than limiting relief to the grants received by the States or their instrumentalities. Plaintiffs' complaint appears to identify several grant recipients that are located within the plaintiff States but that are only "affiliated with" the State or that are local school districts rather than clearly State instrumentalities. *See* Dkt. No. 1, at 18-19, 23-24. Each of those recipients is covered by the district court's injunction, but the court did not meaningfully explain its understanding that each recipient is in fact an instrumentality of a plaintiff. *Cf.* App.3 n.2. And the court's order was not even limited to these ostensibly "affiliated" grantees but extended to all grantees within the plaintiff States. For that reason, the court's order violates the constitutional and equitable principle that relief must be limited to redressing the specific plaintiff's injury. *See Gill v. Whitford*, 585 U.S. 48, 66 (2018); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Second, the district court extended relief that went beyond redressing the specific harm identified by the court. *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 487 (1st Cir. 2009). As explained, the only violation identified by the court is that the termination letters were not, in the court's view, adequately explained. A proper order then would, at most, prevent the Department from relying on those termination letters—and, indeed, might not even do that. *Cf. Seavey v. Barnhart*, 276 F.3d 1, 11 (1st Cir. 2001) ("When an agency has not considered all relevant factors in taking action,

or has provided insufficient explanation for its action, the reviewing court ordinarily should remand the case to the agency.").

    But the district court's order appears to go beyond that, enjoining the government from "reinstating under a different name the termination" of the covered awards, App.9—while also confusingly stating that the government may "terminat[e] any individual" grants if those terminations are "consistent with the Congressional authorization and appropriations, relevant federal statute, including the requirements of the APA, the requirements of the relevant implementing regulations, the grant terms and conditions, and this Court's Order," App.10. Regardless, to the extent that the order in fact prohibits the government from re-terminating grants in plaintiff States with a new explanation, nothing about the court's merits analysis can justify that relief. *Cf. AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State*, No. 25-cv-400, 2025 WL 752378, at *11-13 (D.D.C. Mar. 10, 2025) (rejecting argument that defendants had improperly acted by individually terminating contracts and grants after the court had enjoined the agency's original categorical freeze).

## CONCLUSION

For the foregoing reasons, the Court should grant a stay pending appeal and an immediate administrative stay or, at a minimum, limit the district court's relief.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

LEAH B. FOLEY
  *United States Attorney*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY

 */s/ Sean R. Janda*
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

MARCH 2025

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 5197 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 2016 in proportionally spaced 14-point Garamond typeface.

*/s/ Sean R. Janda*
SEAN R. JANDA

**CERTIFICATE OF SERVICE**

I hereby certify that on March 12, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Sean R. Janda*
SEAN R. JANDA

**APPENDIX**

## TABLE OF CONTENTS

**Page**

Memorandum and Order (Dkt. No. 41)................................................................App.1

Notice of Appeal (Dkt. No. 48) .................................................................... App.11

Declaration of Rachel Oglesby (Dkt. No. 55-1) ............................................ App.13

District Court Docket ..................................................................................... App.18

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

<table>
<tr><td>

——————————————————————<br>
STATE OF CALIFORNIA;<br>
COMMONWEALTH OF MASSACHUSETTS;<br>
STATE OF NEW JERSEY; STATE OF<br>
COLORADO; STATE OF ILLINOIS; STATE<br>
OF MARYLAND; STATE OF NEW YORK;<br>
and STATE OF WISCONSIN,<br>
<br>
        Plaintiffs,<br>
<br>
        v.<br>
<br>
U.S. DEPARTMENT OF EDUCATION;<br>
DENISE CARTER, in her official capacity as<br>
former Acting Secretary of Education and<br>
current acting Chief Operating Officer, Federal<br>
Student Aid; LINDA MCMAHON, in her<br>
official capacity as Secretary of Education,<br>
<br>
        Defendants.<br>
——————————————————————

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

<br><br><br><br><br><br><br><br><br><br>Civil Action No. 25-10548-MJJ

</td></tr>
</table>

## MEMORANDUM AND ORDER ON PLAINTIFF STATES' MOTION FOR TEMPORARY RESTRAINING ORDER

March 10, 2025

JOUN, D.J.

On March 6, 2025, the states of California, Massachusetts, New Jersey, Colorado,

Illinois, Maryland, New York, and Wisconsin (collectively, "Plaintiff States") filed suit against

defendants Secretary of Education Linda McMahon and former Acting Secretary of Education

Denise Carter, in their official capacities, and the United States Department of Education

("Department"; collectively, "Defendants"). Plaintiff States allege that, starting on February 7,

2025, the Department arbitrarily terminated all grants previously awarded under the Teacher

**App.1**

Quality Partnership ("TQP") Program and the Supporting Effective Educator Development ("SEED") Grant Program in violation of the Administrative Procedures Act ("APA").[1]

Plaintiff States filed a Motion for Temporary Restraining Order, [Doc. No. 2], and a hearing was held this afternoon at 2:30 P.M. Upon consideration of Plaintiff States' briefs and supporting evidence, the parties' oral argument, and for the reasons explained below, I GRANT Plaintiff States' Motion and enter a temporary restraining order ("TRO") against Defendants pursuant to the terms outlined at the end of this Order.

## I.  DISTRICT COURT JURISDICTION

Defendants argue the waiver of sovereign immunity in the APA, 5 U.S.C § 702, does not extend to actions of contract which are within the exclusive jurisdiction of the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491. Plaintiff States disagree, arguing waiver of sovereign immunity allows for suit in this Court.

Very recently, another session in this District examined this precise issue in a substantially similar case to this one. *Massachusetts v. Nat'l Institutes of Health,* No. 25-cv-10338, 2025 WL 702163 (D. Mass. Mar. 5, 2025). In that case, in a thoughtful analysis, Judge Angel Kelley determined that the "essence" of the action was not contractual in nature since the source of the plaintiffs' rights was in federal statute and regulations and because the relief was injunctive in nature. *See id.* at *8. I agree with, and adopt, Judge Kelley's reasoning and conclusion. Here, similarly, Plaintiff States seek equitable relief in the form of reinstatement of the TQP and SEED grants. Plaintiff States also seek to enjoin Defendants from implementing, giving effect to, maintaining, or reinstating under a different name the termination of any

---

[1] The parties do not dispute that the termination of SEED and TQP grants constituted final agency action.

**App.2**

previously awarded TQP and SEED grants. In other words, Plaintiff States seek to preserve the previous status quo to alleviate corresponding harm; they are not alleging claims for past pecuniary harms. Plaintiff States have also sufficiently shown that the dispute does not hinge on the terms of a contract between the parties, but rather "federal statute and regulations put in place by Congress and the [Department]." *See id.* at *6. This Court retains jurisdiction.[2]

## II.    TEMPORARY RESTRAINING ORDER

The standard for issuing a TRO—an "extraordinary and drastic remedy"—is "the same as for a preliminary injunction." *Orkin v. Albert*, 557 F. Supp. 3d 252, 256 (D. Mass. 2021) (cleaned up). Plaintiff States must show that weighing the following four interests favors granting a TRO:

> (i) the likelihood that the movant will succeed on the merits; (ii) the possibility that, without an injunction, the movant will suffer irreparable harm; (iii) the balance of relevant hardships as between the parties; and (iv) the effect of the court's ruling on the public interest.

*Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 66 (1st Cir. 2009).

### A.  Likelihood of Success

I begin with the likelihood of success on the merits, which is considered the most important of the four elements and the "sine qua non" of the calculus. *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020). Plaintiff States allege that Defendants committed substantive violations of the APA by taking an agency action that is (1) arbitrary and capricious and an abuse of discretion, and (2) not in accordance with law. Based on the evidence before me now, I find that Plaintiff States are likely to succeed on the merits of their claims.

---

[2] For purposes of the TRO, Plaintiff States have established their recipient institutions of higher education and local educational agencies are public instrumentalities of Plaintiff States, which have standing to bring suit on their behalf.

The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (cleaned up); *see also Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[A] fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." (cleaned up)). That "reasoned explanation requirement . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

The record reflects that there was no individualized analysis of any of the programs; rather, it appears that <u>all</u> TQP and SEED grants were simply terminated. See Doc. 8-13 at 60. And all the programs received the same standardized form letter notifying them of the grant terminations ("Termination Letter"), which states as follows:

> It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. . . . In addition to complying

with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities.

[Doc. No. 1-1 at 2].

I see no reasoned explanation articulated for the Department's action here. First, the Termination Letter lists several theoretical bases for the grant terminations—stating the grants fund programs that, for example, "promote or take part in DEI initiatives" *or* "are not free from fraud, abuse, or duplication" *or* "otherwise fail to serve the best interests of the United States"— but fails to identify which of these bases applies here. This does not reach the level of a reasoned explanation; indeed it amounts to no explanation at all. Second, even accepting any one of these bases as justification for the agency action, such as discrimination related to DEI initiatives, the Termination Letter is arbitrary and capricious because its statements are only conclusory. "[C]onclusory statements will not do; an agency's statement must be one of *reasoning.*" *Amerijet*, 753 F.3d at 1350 (cleaned up); *see also Nat'l Institutes of Health*, 2025 WL 702163, at *18 ("[The agency's] proffered 'reasons' fail to grapple with the relevant factors or pertinent aspects of the problem and fails to demonstrate a rational connection between the facts and choice that was made."). There is no indication that the Department "examine[d] the relevant data," *Motor Vehicle Mfrs.*, 463 U.S. at 29; to the contrary, the record reflects a lack of the individualized reasoning and analysis required. To the extent that Defendants claim that it is sufficient explanation for the Department to baldly assert that the grants "no longer effectuate[]

Department policies," such an assertion cannot stand. In the absence of any reasoning, rationale, or justification for the termination of the grants, the Department's action is arbitrary and capricious.

The Department's failure to provide a reasoned explanation is "even more egregious in light of the drastic change" from the existing policies under which the grant awards had been authorized. *Nat'l Institutes of Health*, 2025 WL 702163, at *18. "Although a change in policy does not result in a heightened standard of review, if an agency's 'new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests' an agency's failure to consider such factors 'would be arbitrary or capricious.'" *Id.* (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). In such cases, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). As described, the Termination Letter failed to provide any reasoned explanation, let alone one that considered the facts and circumstances underlying the prior policy.

For these reasons, Plaintiff States are likely to succeed in their claims that the Department's action in terminating the grants is arbitrary and capricious.[3]

### B. Irreparable Harm

Plaintiff States have adequately shown that they would be irreparably harmed if temporary relief were not granted. An "irreparable injury" for the purposes of preliminary relief is "an injury that cannot adequately be compensated for either by a later-issued permanent

---

[3] This suffices for purpose of the present TRO and I need not, at this time, reach the argument in Count II that there exists a separate ground for a substantive violation of the APA, i.e., an action not in accordance with the law.

injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). "The necessary concomitant of irreparable harm is the inadequacy of traditional legal remedies. The two are flip sides of the same coin: if money damages will fully alleviate harm, then the harm cannot be said to be irreparable." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 914 (1st Cir. 1989). Here, there is ample evidence that the Department's termination of all previously awarded TQP and SEED grants has already harmed, and will continue to harm, the programs and employees of those programs that rely on these grants. *See* [Doc. No. 8; Doc. Nos. 8-1 to 8-21].

The termination of funding for a program at the California State University with the objective of training and developing "highly qualified community-centered teachers who could staff and support high-need or high-poverty urban K-12 schools and students, particularly with regard in the areas of special education," has resulted in the loss of mentoring, training, and vital support for 26 students, and the loss of financial stipends for about 50 incoming students who need these stipends to participate in classroom teaching. [Doc. No. 8-3 at ¶¶ 7, 16, 22]. In New Jersey, The College of New Jersey was forced to cancel the remainder of its urban teacher residency program due to the loss of its TQP grant. [Doc. No. 8-9 at ¶ 21]. Here in Massachusetts, where Boston Public Schools had relied on their TQP grant to support their teacher pipeline programming designed to address the need and shortage of multilingual educators, [Doc. No. 8-2 at ¶ 8], the abrupt termination of this grant has resulted in the loss of three-full time employees who were being funded by the grant. [*Id.* at ¶ 28]. Thus, it is apparent that the harms which have already resulted, and which will continue to result, from the grant terminations are irreparable.

Moreover, I agree with Plaintiff States that a later-issued permanent injunction or damages remedy cannot compensate for such loss of federal funding. [*See* Doc. No. 7 at 24]. Plaintiff States have sufficiently established that the loss of this funding "threatens the very existence" of the teacher pipeline programs implemented by Plaintiff States, and there is no traditional remedy that can compensate Plaintiff States for the disruptions and discord resulting from the abrupt terminations of these grants. *Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986); *see also Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 242 (D.D.C. 2014) (unrecoverable funds can constitute irreparable harm). The record shows how the terminations have "upended months, if not years" of work required to implement programs that rely on these grants, and how terminations have impacted "budgets for staff, coursework, partner organizations, school districts, and student populations" and existing projects or projects already in progress. [Doc. No. 7 at 25]; *see, e.g.*, [Doc. No. 8-1 at ¶¶ 20-22 (loss of grant hindered a program at University of Massachusetts Amherst that was one and a half years into a five-year project with significant deliverables already scheduled); [Doc. No. 8-12 at ¶ 18 (grant termination interrupted recruitment and retention activities)].

For these reasons, Plaintiff States have established irreparable harm. *See K–Mart,* 875 F.2d at 915 ("District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief") (cleaned up).

### C.  Balance of Hardships/Effect on Public Interest

Finally, upon consideration of the last two factors, the balance of the equities weighs heavily in favor of granting Plaintiff States' TRO, and a TRO would serve the public interest.[4]

---

[4] The last two factors "merge when the Government is the party opposing the [TRO]." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The record shows that if I were to deny the TRO, dozens of programs upon which public schools, public universities, students, teachers, and faculty rely will be gutted. On the other hand, if I were to grant the TRO, as another court has put it, Defendants "merely would have to disburse funds that Congress has appropriated to the States and others." *New York v. Trump*, 25-cv-39, 2025 WL 357368, at *4 (D.R.I. Jan. 31, 2025) (cleaned up). I find that, "absent such an order, there is a substantial risk that the States and its citizens will face a significant disruption in health, education, and other public services that are integral to their daily lives due to this pause in federal funding." *Id.* Further, "[t]he fact that [Plaintiff States] have shown a likelihood of success on the merits strongly suggests that a TRO would serve the public interest." *Id.* Accordingly, the last two factors weigh in favor of granting Plaintiff States' TRO.

### III.    CONCLUSION

For the reasons stated above, Plaintiff States' Motion for Temporary Restraining Order, [Doc. No. 2], is <u>GRANTED</u>. It is therefore <u>ORDERED</u> that, until further order is issued by this Court:

1.    Defendants shall immediately restore Plaintiff States to the pre-existing status quo prior to the termination under all previously awarded TQP or SEED grants for recipients in Plaintiff States;

2.    Defendants are temporarily enjoined from implementing, giving effect to, maintaining, or reinstating under a different name the termination of any previously awarded TQP or SEED grants for recipients in Plaintiff States, including but not limited to through the Termination Letter, Termination GAN, and any other agency actions implementing such terminations, such as suspension or withholding of any funds approved and obligated for the grants;

3.      Defendants are temporarily enjoined from terminating any individual TQP and SEED grant for recipients in Plaintiff States, except to the extent the final agency action is consistent with the Congressional authorization and appropriations, relevant federal statute, including the requirements of the APA, the requirements of the relevant implementing regulations, the grant terms and conditions, and this Court's Order;

4.      Within 24 hours of entry of this Order, Defendants shall provide notice of the TRO to their employees and anyone acting in concert with them, and to all TQP and SEED grantees in Plaintiff States;

5.      Defendants shall file a status report with the Court, within 24 hours of entry of this Order, confirming their compliance with the Court's TRO;

6.      This TRO shall become effective immediately upon entry by this Court. The TRO shall remain in effect for 14 days; and

7.      By March 11, 2025 at 5 P.M., the parties shall jointly propose a briefing schedule regarding Plaintiff States' request for preliminary injunction.


SO ORDERED.

                                        /s/ Myong J. Joun
                                        United States District Judge

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **STATE OF CALIFORNIA, et al.** | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| v. | ) | Civil Action No. 25-10548-MJJ |
| | ) | |
| **U.S. DEPARTMENT OF** | ) | |
| **EDUCATION, et al.** | ) | |
| **Defendants** | ) | |

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Defendants in the above-captioned case hereby appeal to the United States Court of Appeals for the First Circuit from the district court's (Joun, J.) March 10, 2025 <u>Memorandum and Order</u>, ECF No. 41 (docketed on March 10, 2025).

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:  <u>/s/ Michael L. Fitzgerald</u>
Michael L. Fitzgerald
Assistant U.S. Attorney

1

Certificate of Service

I hereby certify that on March 11, 2025, this Notice of Appeal filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Michael L. Fitzgerald
Michael L. Fitzgerald
Assistant U.S. Attorney

2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA;
COMMONWEALTH OF
MASSACHUSETTS; STATE OF NEW
JERSEY; STATE OF COLORADO; STATE
OF ILLINOIS; STATE OF MARYLAND;
STATE OF NEW YORK; AND STATE OF
WISCONSIN,

                Plaintiffs,

     v.

U.S. DEPARTMENT OF EDUCATION;
DENISE CARTER, IN HER OFFICIAL
CAPACITY AS FORMER ACTING
SECRETARY OF EDUCATION AND
CURRENT ACTING CHIEF OPERATING
OFFICER, FEDERAL STUDENT AID;
LINDA MCMAHON, IN HER OFFICIAL
CAPACITY AS SECRETARY OF
EDUCATION,

                Defendants.

No. 1:25-cv-10548-MJJ

## DECLARATION OF RACHEL OGLESBY

1. My name is Rachel Oglesby. The following is based on my personal knowledge or information provided to me in the course of performing my duties at the United States Department of Education ("Department").

2. I am currently employed at the Department as Chief of Staff. I began my service at the Department on January 20, 2025.

3. Before joining the Department, I worked at America First Policy Institute as the Chief State Action Officer and Director of the Center for the American Worker.

4. In my role at the Department, I have the following responsibilities:

a. I assist the Secretary of Education with all of her responsibilities running the Department.

b. I advise the Secretary on significant matters within and affecting the Department.

c. I performed the same functions for the Acting Secretary of Education.

5. On February 5, 2025, Denise Carter, Acting Secretary of Education, issued a Directive on Department Grant Priorities. According to that Directive, "Department personnel shall conduct an internal review of all new grant awards, grants that have not yet been awarded to specific individuals or entities (e.g., notices of funding opportunities), and issued grants. Such review shall be limited to ensuring that Department grants do not fund discriminatory practices—including in the form of [diversity, equity, and inclusion ("DEI")]—that are either contrary to law or to the Department's policy objectives, as well as to ensure that all grants are free from fraud, abuse, and duplication."

6. The Department implemented that Directive by individually reviewing every grant issued under the Teacher Quality Partnership ("TQP") Program and the Supporting Effective Educator Development ("SEED") Program. The review process involved seven personnel over one week.

7. As part of this individualized review process, the Department reviewed the language of each grant application, including the grant applications at issue here. The Department also reviewed publicly available information about what the grantees used federal funds to teach. Finally, the Department reviewed the terms and conditions of each grant agreement.

8. All of the grants at issue were awarded before October 1, 2024. The invitations for all of these grants, which were published in the Federal Register, are considered part of the "terms and conditions" of the Department's grant awards. Those invitations permitted the Department to "[t]erminat[e] agreements in whole or in part to the greatest extent authorized by law if an award no longer effectuates the program goals or agency priorities (2 CFR 200.340)."

9. The Department did not merely terminate any program that mentioned "diversity." Rather, the Department reviewed applications to determine whether they included objectionable material associated with DEI, such as cultural responsiveness, systemic privilege, racial justice, social justice, and anti-racism.

10. Based on that initial review, the Department compiled a database of all projects in TQP and SEED flagged as incorporating DEI. The database connected specific grant applications to DEI language in the grant applications and to publicly available material that indicated the projects taught DEI.

11. For example, one grant funded a project that involved a "racial and ethnic autobiography" that asked whether individuals ever "felt threatened? marginalized? privileged?" and how they would "seek to challenge power imbalances and ensure all individuals and communities, particularly those that experienced marginalization are included." That grant was flagged as funding DEI contrary to the Secretary's directive.

12. Another grant funded a project that proposed to address "equity and culturally responsive practices and [would] cover the following possible topics: Building Cultural Competence, Dismantling Racial Bias, Centering Equity in the Classroom, Family and Community in the Classroom, and Culturally Inclusive Teaching." That grant was likewise flagged.

13. Another project promised to prepare "JEDI teachers focused on justice, equity, diversity, and inclusion." That grant was likewise flagged.

14. Another grant funded a project "centered around social-emotional learning (SEL) and diversity, equity, and inclusion (DEI) practices, embedded throughout the teacher preparation curricula and foundational courses. The result will be educators who are purposeful in implementing cultural and SEL/DEI practices with fidelity." That grant was likewise flagged.

15. Another grant funded a project to "develop informational sessions for entering prospective residents[,] teachers[,] and university supervisors to include bias training and social emotional learning and social justice curriculum." That grant was also flagged.

16. Still another grant was flagged that funded a project about "anchoring programs and practices in culturally responsive-sustaining pedagogies, enacting anti-racist pedagogies, and modeling inclusive practices."

17. Using the database, the Department confirmed on a grant-by-grant basis that termination was permitted under the terms and conditions of the grant agreement.

18. The Department's senior leadership, including those appointed by the President and Secretary, reviewed every entry in the database and, pursuant to the Acting Secretary's Directive, confirmed each Department grant "fund[ed] discriminatory practices—including in the form of DEI—that are either contrary to law or to the Department's policy objectives."

19. The Department determined that the programs at issue here incorporated DEI, reviewed the terms and conditions of the grants at issue to ensure they permitted termination, and concluded that funding for these grants must cease based on the Acting Secretary's Directive.

20. Department leadership then ordered responsible officials to terminate grants—including the grants at issue here—that incorporated DEI in violation of the Acting Secretary's Directive.

21. Accordingly, the Department's Deputy Assistant Secretary for the Office of Management and Planning signed termination letters notifying grantees that their awards had been terminated, effective between February 7 and February 12, 2025.

22. The letters were individually addressed to each recipient and identified the individual federal award number.

23. The letters explained that "[i]llegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education." In addition, the letters stated "it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States."

24. The letters reasoned that the funded programs "promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; … violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; … are not free from fraud, abuse, or duplication; or … otherwise fail to serve the best interests of the United States."

25. Because the grants were "inconsistent with, and no longer effectuate[], Department priorities," they were canceled "pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in" the awards.

26. The termination letters informed grantees of their ability to take an administrative appeal to the Acting Assistant Secretary for the Office of Elementary and Secondary Education.

27. The Department terminated 104 grants awarded under the TQP and SEED programs. Five grants remain in place.

28. To comply with the district court's Order issued in the above-captioned action on March 10, 2025, the Department has restored access to funds and lifted payment restrictions for grantees who received a grant termination letter.

29. While the Order is in effect, grantees could, and will be strongly incentivized to, quickly draw down the $65 million still outstanding under their awards.

30. Payments go out from the Department to grantees within one to three days.

31. In general, grantees can draw money from their accounts with no internal checks or corroboration. Grantees typically draw funds on a regular schedule that matches the lifecycle of the grant, but that schedule is customary rather than mandatory. Indeed, the Department must permit grantees to submit payment requests as often as they like. And there are only limited safeguards against early withdrawals.

32. Grantees have every incentive to quickly draw down the remaining funds here. Under the Order, grantees have a minimum of 14 days—and potentially much longer under any preliminary injunction—to pull down every dollar they can get.

33. Absent emergency relief, there is a significant risk of grantees attempting to withdraw tens of millions of dollars on canceled grants.

34. No grantees have provided assurances to the Department that they will refrain from attempting large withdrawals that deplete most or all of the remaining grant funds.

35. On the contrary, since the district court entered the Order, multiple grantees have initiated payment requests on their canceled grants.

36. Grantees have little to lose by rapidly drawing down funds. Once funds leave the Department and go to grantees, the Department has limited ability to recover those disbursed funds. Nor has any grantee promised to return withdrawn funds should its grant termination be reinstated—exacerbating the significant risk that substantial taxpayer dollars will be lost forever due to the Court's order absent emergency relief.

\*\*\*

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, DC this 12th day of March.

*Rachel Oglesby*
Rachel Oglesby

APPEAL

**United States District Court**
**District of Massachusetts (Boston)**
**CIVIL DOCKET FOR CASE #: 1:25−cv−10548−MJJ**

State of California et al v. U.S Department of Education et al
Assigned to: Judge Myong J. Joun
Case in other court:  USCA − First Circuit, 25−01244
Cause: 05:551 Administrative Procedure Act

Date Filed: 03/06/2025
Jury Demand: None
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review or
Appeal of Agency Decision
Jurisdiction: Federal Question

**Plaintiff**

| | | |
|---|---|---|
| **State of California** | represented by | **Laura Faer**<br>Office of The Attorney General<br>1515 Clay Street<br>Ste 20th Floor<br>Oakland, CA 94612<br>510−879−3304<br>Email: laura.faer@doj.ca.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Chris Pappavaselio**<br>Massachusetts Attorney General's Office<br>One Ashburton Place<br>Boston, MA 02108<br>213−219−0765<br>Email: chris.pappavaselio2@mass.gov<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Commonwealth of Massachusetts** | represented by | **Adelaide H. Pagano**<br>Massachusetts Attorney General's Office<br>One Ashburton Place<br>Boston, MA 02108<br>617−963−2122<br>Email: adelaide.pagano@mass.gov<br>*ATTORNEY TO BE NOTICED* |
| | | **Chris Pappavaselio**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Matthew G. Lindberg**<br>Office of the Attorney General<br>10 Mechanic Street<br>#301<br>Boston, MA 01608<br>617−963−2169<br>*ATTORNEY TO BE NOTICED* |
| | | **Megan E. Barriger**<br>Massachusetts Office of the Attorney<br>General<br>One Ashburton Place<br>Boston, MA 02108<br>617−963−2038<br>Email: megan.barriger@mass.gov<br>*ATTORNEY TO BE NOTICED* |
| | | **Yael Shavit**<br>Office of the Attorney General |

**App.18**

One Ashburton Place
Boston, MA 02108
617−963−2197
Email: yael.shavit@mass.gov
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of New Jersey**                    represented by    **Amanda I. Morejon**
New Jersey Attorney General's Office
124 Halsey St., 5th Fl.
Newark, NJ 07101
609−696−5279
Email: amanda.morejon@law.njoag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth R. Walsh**
New Jersey Office of the Attorney General
124 Halsey Street
PO Box 45029
Newark, NJ 07101
609−696−5289
Email: elizabeth.walsh@law.njoag.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica L Palmer**
NJ Office of the Attorney General
25 Market Street
Trenton, NJ 08861
609−696−4607
Email: jessica.palmer@law.njoag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren Elizabeth Van Driesen**
New Jersey Office of the Attorney General
124 Halsey Street
5th Floor
Newark, NJ 07101
973−648−2566
Email: lauren.vandriesen@law.njoag.gov
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Colorado**                    represented by    **Chris Pappavaselio**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Illinois**                    represented by    **Darren Bernens Kinkead**
Illinois Attorney General's Office
115 South LaSalle Street
Chicago, IL 60603
773−590−6967
Email: darren.kinkead@ilag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chris Pappavaselio**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Maryland**

**Plaintiff**

**State of New York**                                     represented by    **Sandra S. Park**
                                                                            NYS Office of The Attorney General
                                                                            28 Liberty Street
                                                                            Ste 20th Floor
                                                                            New York, NY 10005
                                                                            212−416−8250
                                                                            Email: sandra.park@ag.ny.gov
                                                                            *LEAD ATTORNEY*
                                                                            *ATTORNEY TO BE NOTICED*

                                                                            **Alex Finkelstein**
                                                                            NYS Office of The Attorney General
                                                                            The Capitol
                                                                            Albany, NY 12224
                                                                            212−416−6129
                                                                            Email: alex.finkelstein@ag.ny.gov
                                                                            *ATTORNEY TO BE NOTICED*

                                                                            **Chris Pappavaselio**
                                                                            (See above for address)
                                                                            *ATTORNEY TO BE NOTICED*

                                                                            **Kathryn Meyer**
                                                                            NYS Office of The Attorney General
                                                                            28 Liberty Street
                                                                            New York, NY 10005
                                                                            212−416−8844
                                                                            Fax: 212−416−6030
                                                                            Email: kathryn.meyer@ag.ny.gov
                                                                            *ATTORNEY TO BE NOTICED*

                                                                            **Monica Hanna**
                                                                            NYS Office of The Attorney General
                                                                            28 Liberty Street
                                                                            New York, NY 10005
                                                                            212−416−8227
                                                                            Fax: 212−416−6009
                                                                            Email: monica.hanna@ag.ny.gov
                                                                            *ATTORNEY TO BE NOTICED*

                                                                            **Rabia Muqaddam**
                                                                            NYS Office of The Attorney General
                                                                            28 Liberty St.
                                                                            New York, NY 10005
                                                                            917−715−4172
                                                                            Email: rabia.muqaddam@ag.ny.gov
                                                                            *ATTORNEY TO BE NOTICED*

                                                                            **Wil Handley**
                                                                            NYS Office of The Attorney General
                                                                            State Capitol
                                                                            Albany, NY 12224
                                                                            212−416−6323
                                                                            Email: wil.handley@ag.ny.gov
                                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Wisconsin**                                     represented by

**App.20**

**Aaron Bibb**
Wisconsin Department of Justice
Special Litigation & Appeals
17 West Main St.
Madison, WI 53703
608−266−0810
Email: bibbaj@doj.state.wi.us
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Chris Pappavaselio**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**U.S Department of Education**          represented by   **Michael Fitzgerald**
United States Attorney's Office MA
1 Courthouse Way
Suite 9200
Boston, MA 02210
617−748−3266
Email: Michael.fitzgerald2@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Denise Carter**          represented by   **Michael Fitzgerald**
*in her official capacity as former Acting*          (See above for address)
*Secretary of Education and current*          *ATTORNEY TO BE NOTICED*
*acting Chief Operating Officer, Federal*
*Student Aid*

**Defendant**

**Linda McMahon**          represented by   **Michael Fitzgerald**
*in her official capacity as Secretary of*          (See above for address)
*Education*          *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/06/2025 | 1 | COMPLAINT against All Defendants Filing fee: $ 405, receipt number AMADC−10876076 (Fee Status: Filing Fee paid), filed by State of California, Commonwealth of Massachusetts, State of New Jersey, State of Colorado, State of Illinois, State of Maryland, State of New York, State of Wisconsin. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Civil Cover Sheet, # 4 Category Form)(Pagano, Adelaide) Modified on 3/6/2025 (NMC). (Entered: 03/06/2025) |
| 03/06/2025 | 2 | MOTION for Temporary Restraining Order by State of California, Commonwealth of Massachusetts, State of New Jersey, State of Colorado, State of Illinois, State of Maryland, State of New York, State of Wisconsin. (Attachments: # 1 Text of Proposed Order)(Pagano, Adelaide) Modified on 3/6/2025 (NMC). (Entered: 03/06/2025) |
| 03/06/2025 | 3 | MOTION for Leave to File Excess Pages by State of California, Commonwealth of Massachusetts, State of New Jersey, State of Colorado, State of Illinois, State of Maryland, State of New York, State of Wisconsin.(Pagano, Adelaide) Modified on 3/6/2025 (NMC). (Entered: 03/06/2025) |
| 03/06/2025 | 4 | ELECTRONIC NOTICE of Case Assignment. Judge Myong J. Joun assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Donald L. Cabell. (CEH) (Entered: 03/06/2025) |

| | | |
|---|---|---|
| 03/06/2025 | 5 | Summons Issued as to All Defendants. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (NMC) (Entered: 03/06/2025) |
| 03/06/2025 | 6 | Judge Myong J. Joun: ELECTRONIC ORDER entered granting 3 Plaintiffs' Motion for Leave to File Excess Pages. (JL) (Entered: 03/06/2025) |
| 03/06/2025 | 7 | MEMORANDUM in Support re 2 MOTION for Temporary Restraining Order filed by State of California, Commonwealth of Massachusetts, State of New Jersey, State of Colorado, State of Illinois, State of Maryland, State of New York, State of Wisconsin. (Pagano, Adelaide) (Entered: 03/06/2025) |
| 03/06/2025 | 8 | DECLARATION re 7 Memorandum in Support of Motion, 2 MOTION for Temporary Restraining Order *Declar* by State of California, Commonwealth of Massachusetts, State of New Jersey, State of Colorado, State of Illinois, State of Maryland, State of New York, State of Wisconsin. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21)(Pagano, Adelaide) (Attachment 5 replaced on 3/12/2025) (SP). (Attachment 7 replaced on 3/12/2025) (SP). (Attachment 11 replaced on 3/12/2025) (SP). **Modified on 3/12/2025 to replace corrected ECF exhibits as they were not readable.** (SP). (Entered: 03/06/2025) |
| 03/06/2025 | 9 | NOTICE of Appearance by Chris Pappavaselio on behalf of Commonwealth of Massachusetts (Pappavaselio, Chris) (Entered: 03/06/2025) |
| 03/06/2025 | 10 | NOTICE of Appearance by Amanda I. Morejon on behalf of State of New Jersey (Morejon, Amanda) (Entered: 03/06/2025) |
| 03/06/2025 | 11 | MOTION for Leave to Appear Pro Hac Vice for admission of Aaron Bibb Filing fee: $ 125, receipt number AMADC−10877340 by State of Wisconsin. (Attachments: # 1 Certificate of Aaron Bibb)(Pappavaselio, Chris) (Entered: 03/06/2025) |
| 03/06/2025 | 12 | NOTICE of Appearance by Megan E. Barriger on behalf of Commonwealth of Massachusetts (Barriger, Megan) (Entered: 03/06/2025) |
| 03/06/2025 | 13 | MOTION for Leave to Appear Pro Hac Vice for admission of Alex Finkelstein, Kathryn Claire Meyer, Monica Hanna, Rabia Muqaddam, Sandra Park, Wil Handley Filing fee: $ 750, receipt number AMADC−10877343 by State of New York. (Attachments: # 1 Certificate of Alex Finkelstein, # 2 Certificate of Kathryn Claire Meyer, # 3 Certificate of Monica Hanna, # 4 Certificate of Rabia Muqaddam, # 5 Certificate of Sandra Park, # 6 Certificate of Wil Handley)(Pappavaselio, Chris) (Entered: 03/06/2025) |
| 03/06/2025 | 14 | MOTION for Leave to Appear Pro Hac Vice for admission of Alexis Piazza, Garrett Lindsey, Heidi Joya, Laura Faer, Maureen Onyeagbako Filing fee: $ 625, receipt number AMADC−10877345 by State of California. (Attachments: # 1 Certificate of Alexis Piazza, # 2 Certificate of Garrett Lindsey, # 3 Certificate of Heidi Joya, # 4 Certificate of Laura Faer, # 5 Certificate of Maureen Onyeagbako)(Pappavaselio, Chris) (Entered: 03/06/2025) |
| 03/06/2025 | 15 | MOTION for Leave to Appear Pro Hac Vice for admission of Darren Kinkead Filing fee: $ 125, receipt number AMADC−10877347 by State of Illinois. (Attachments: # 1 Certificate of Darren Kinkead)(Pappavaselio, Chris) (Entered: 03/06/2025) |
| 03/07/2025 | 16 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** 11 Motion for Leave to Appear Pro Hac Vice Added Aaron J. Bibb. **Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen−current−pacer−accounts.htm#link−account. (SP) (Entered: 03/07/2025) |
| 03/07/2025 | 17 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** 13 Motion for Leave to Appear Pro Hac Vice Added Alex Finkelstein, Kathryn Claire Meyer, Monica Hanna, |

Rabia Muqaddam, Sandra Park, Wil Handley.

**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**

Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm.

A Notice of Appearance must be entered on the docket by the newly admitted attorney.

(SP) (Entered: 03/07/2025)

| 03/07/2025 | 18 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** <u>14</u> Motion for Leave to Appear Pro Hac Vice Added Laura Faer, Heidi Joya, Maureen Onyeagbako, Alexis Piazza, and Garrett Lindsey.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(SP) (Entered: 03/07/2025) |
| --- | --- | --- |
| 03/07/2025 | 19 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** <u>15</u> Motion for Leave to Appear Pro Hac Vice Added Darren Kinkead.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(SP) (Entered: 03/07/2025) |
| 03/07/2025 | 20 | Judge Myong J. Joun: ORDER Setting Hearing on Motion<br><br>Motion Hearing Doc. <u>2</u> set for 3/10/2025 02:30 PM in Courtroom 20 (In person only) before Judge Myong J. Joun.<br><br>**It is further ORDERED that Plaintiffs shall serve a copy of this Order on Defendants immediately upon receipt to ensure that Defendants' counsel will appear at the hearing.** (SP) (Entered: 03/07/2025) |
| 03/07/2025 | <u>21</u> | NOTICE of Appearance by Yael Shavit on behalf of Commonwealth of Massachusetts (Shavit, Yael) (Entered: 03/07/2025) |
| 03/07/2025 | <u>22</u> | MOTION for Leave to Appear Pro Hac Vice for admission of Jessica L. Palmer by State of New Jersey. (Attachments: # <u>1</u> Affidavit Certificate of Jessica L. Palmer)(Morejon, Amanda) (Entered: 03/07/2025) |

| 03/07/2025 | 23 | MOTION for Leave to Appear Pro Hac Vice for admission of Elizabeth R. Walsh by State of New Jersey. (Attachments: # 1 Affidavit Certificate of Elizabeth R. Walsh)(Morejon, Amanda) (Entered: 03/07/2025) |
|---|---|---|
| 03/07/2025 | 24 | NOTICE of Appearance by Darren Bernens Kinkead on behalf of State of Illinois (Kinkead, Darren) (Entered: 03/07/2025) |
| 03/07/2025 | 25 | NOTICE of Appearance by Alex Finkelstein on behalf of State of New York (Finkelstein, Alex) (Entered: 03/07/2025) |
| 03/07/2025 | 26 | NOTICE of Appearance by Kathryn Meyer on behalf of State of New York (Meyer, Kathryn) (Entered: 03/07/2025) |
| 03/07/2025 | 27 | NOTICE of Appearance by Rabia Muqaddam on behalf of State of New York (Muqaddam, Rabia) (Entered: 03/07/2025) |
| 03/07/2025 | 28 | NOTICE of Appearance by Sandra S. Park on behalf of State of New York (Park, Sandra) (Entered: 03/07/2025) |
| 03/07/2025 | 29 | NOTICE of Appearance by Monica Hanna on behalf of State of New York (Hanna, Monica) (Entered: 03/07/2025) |
| 03/07/2025 | 30 | NOTICE of Appearance by Michael Fitzgerald on behalf of Denise Carter, Linda McMahon, U.S Department of Education (Fitzgerald, Michael) (Entered: 03/07/2025) |
| 03/07/2025 | 31 | NOTICE of Appearance by Adelaide H. Pagano on behalf of Commonwealth of Massachusetts (Pagano, Adelaide) (Entered: 03/07/2025) |
| 03/10/2025 | 32 | NOTICE OF ATTORNEY PAYMENT OF FEES as to 22 MOTION for Leave to Appear Pro Hac Vice for admission of Jessica L. Palmer, 23 MOTION for Leave to Appear Pro Hac Vice for admission of Elizabeth R. Walsh by Plaintiff State of New Jersey. Filing fee $ 250, receipt number AMADC−10880513. Payment Type : PRO HAC VICE. (Morejon, Amanda) (Entered: 03/10/2025) |
| 03/10/2025 | 33 | NOTICE of Appearance by Matthew G. Lindberg on behalf of Commonwealth of Massachusetts (Lindberg, Matthew) (Entered: 03/10/2025) |
| 03/10/2025 | 34 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** 22 Motion for Leave to Appear Pro Hac Vice Added Jessica L. Palmer. <br><br> **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** <br><br> Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm. <br><br> A Notice of Appearance must be entered on the docket by the newly admitted attorney. <br><br> (SP) (Entered: 03/10/2025) |
| 03/10/2025 | 35 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** 23 Motion for Leave to Appear Pro Hac Vice Added Elizabeth R. Walsh. <br><br> **Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen−current−pacer−accounts.htm#link−account. <br><br> (SP) (Entered: 03/10/2025) |
| 03/10/2025 | 36 | NOTICE of Appearance by Elizabeth R. Walsh on behalf of State of New Jersey (Walsh, Elizabeth) (Entered: 03/10/2025) |

| | | |
|---|---|---|
| 03/10/2025 | 37 | MOTION for Leave to Appear Pro Hac Vice for admission of Lauren E. Van Driesen Filing fee: $ 125, receipt number AMADC−10882878 by State of New Jersey. (Attachments: # 1 Affidavit Certificate of Lauren E. Van Driesen)(Morejon, Amanda) (Entered: 03/10/2025) |
| 03/10/2025 | 38 | Electronic Clerk's Notes for proceedings held before Judge Myong J. Joun: Hearing held on 3/10/2025 re 2 MOTION for Temporary Restraining Order filed by State of Wisconsin, State of California, State of New Jersey, State of Maryland, State of Illinois, Commonwealth of Massachusetts, State of New York, State of Colorado. Caee no. 25cv702, out of Maryland noted; Court heard arguments and took said motion under advisement. (Court Reporter: Jamie Halpin at jkhhalpin@gmail.com)(Attorneys present: Barriger, Pagano, Faer, Palmer, and Shavit for the pltffs; Fitzgerald for the defts) (JL) (Entered: 03/10/2025) |
| 03/10/2025 | 39 | NOTICE of Appearance by Jessica L Palmer on behalf of State of New Jersey (Palmer, Jessica) (Entered: 03/10/2025) |
| 03/10/2025 | 40 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** 37 Motion for Leave to Appear Pro Hac Vice Added Lauren E. Van Drisen. <br><br> **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** <br><br> Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm. <br><br> A Notice of Appearance must be entered on the docket by the newly admitted attorney. <br><br> (SP) (Entered: 03/10/2025) |
| 03/10/2025 | 41 | Judge Myong J. Joun: ORDER entered. MEMORANDUM AND ORDER **GRANTING** Doc. 2 on Plaintiff States' Motion for Temporary Restraining Order(SP) (Entered: 03/10/2025) |
| 03/11/2025 | 42 | AFFIDAVIT OF SERVICE Executed by State of Maryland, State of New Jersey, State of New York, Commonwealth of Massachusetts, State of Wisconsin, State of California, State of Colorado, State of Illinois. All Defendants. Acknowledgement filed by State of Maryland, State of New Jersey, State of New York, Commonwealth of Massachusetts, State of Wisconsin, State of California, State of Colorado, State of Illinois. (Attachments: # 1 Exhibit 1)(Pagano, Adelaide) (Entered: 03/11/2025) |
| 03/11/2025 | 43 | NOTICE of Appearance by Wil Handley on behalf of State of New York (Handley, Wil) (Entered: 03/11/2025) |
| 03/11/2025 | 44 | MOTION for Leave to Appear Pro Hac Vice for admission of David Moskowitz Filing fee: $ 125, receipt number AMADC−10885257 by State of Colorado. (Attachments: # 1 Certificate of David Moskowitz)(Pappavaselio, Chris) (Entered: 03/11/2025) |
| 03/11/2025 | 45 | NOTICE of Appearance by Lauren Elizabeth Van Driesen on behalf of State of New Jersey (Van Driesen, Lauren) (Entered: 03/11/2025) |
| 03/11/2025 | 46 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** 44 Motion for Leave to Appear Pro Hac Vice Added David Moskowitz. <br><br> **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a Pacer account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** <br><br> Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm. <br><br> A Notice of Appearance must be entered on the docket by the newly admitted attorney. |

| | | |
|---|---|---|
| | | (SP) (Entered: 03/11/2025) |
| 03/11/2025 | 47 | STATUS REPORT *Joint Submission Regarding Preliminary Injunction Briefing Schedule* by Denise Carter, Linda McMahon, State of California, Commonwealth of Massachusetts, State of New Jersey, State of Colorado, State of Illinois, State of Maryland, State of New York, State of Wisconsin, U.S Department of Education. (Pagano, Adelaide) (Entered: 03/11/2025) |
| 03/11/2025 | 48 | NOTICE OF APPEAL as to 41 Memorandum & ORDER by Denise Carter, Linda McMahon, U.S Department of Education. Fee Status: US Government. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 3/31/2025. (Fitzgerald, Michael) (Entered: 03/11/2025)** |
| 03/11/2025 | 49 | NOTICE of Appearance by Laura Faer on behalf of State of California (Faer, Laura) (Entered: 03/11/2025) |
| 03/11/2025 | 50 | STATUS REPORT by Denise Carter, Linda McMahon, U.S Department of Education. (Fitzgerald, Michael) (Entered: 03/11/2025) |
| 03/12/2025 | 51 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 48 Notice of Appeal. (MAP) (Entered: 03/12/2025) |
| 03/12/2025 | 52 | Judge Myong J. Joun: ELECTRONIC ORDER entered. The Court acknowledges receipt of the parties' joint submission regarding preliminary injunction briefing schedule, Doc. No. 47 . The Plaintiff States' Motion for Temporary Restraining Order ("TRO"), Doc. No. 2 , and Memorandum in Support, Doc. No. 7 , shall be treated as a Motion for Preliminary Injunction. The Court sets the following schedule: • Defendants shall have until Monday March 17, 2025, to file a Memorandum in Opposition to Plaintiff States' Motion for Preliminary Injunction. • Plaintiff States shall have until Friday March 21, 2025, to file a Reply in support of their Motion for Preliminary Injunction. • Hearing on the motion is SET for Friday March 28, 2025 at 2:00 PM. If Defendants consent to an extension of the Court's March 10, 2025 TRO up to and including April 14, 2025, Defendant shall file a status report by Friday March 14, 2025 at 5:00 PM giving such consent, at which time the Court will RESET the above schedule as follows: • Defendants shall have until Friday March 21, 2025, to file a Memorandum in Opposition to Plaintiff States' Motion for Preliminary Injunction. • Plaintiff States shall have until Friday March 28, 2025, to file a Reply in support of their Motion for Preliminary Injunction. • Hearing on the motion SET for Friday April 4, 2025 at 10:00 AM. (SP) (Entered: 03/12/2025) |
| 03/12/2025 | 53 | USCA Case Number 25−1244 for 48 Notice of Appeal, filed by U.S Department of Education, Linda McMahon, Denise Carter. (MAP) (Entered: 03/12/2025) |
| 03/12/2025 | 54 | Emergency MOTION to Stay re 41 Memorandum & ORDER *Pending Appeal* by Denise Carter, Linda McMahon, U.S Department of Education.(Fitzgerald, Michael) (Entered: 03/12/2025) |

| 03/12/2025 | 55 | MEMORANDUM in Support re 54 Emergency MOTION to Stay re 41 Memorandum & ORDER *Pending Appeal* filed by Denise Carter, Linda McMahon, U.S Department of Education. (Attachments: # 1 Exhibit Oglesby Declaration)(Fitzgerald, Michael) (Entered: 03/12/2025) |