**No. 25-1244**

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEW JERSEY; STATE OF COLORADO; STATE OF ILLINOIS; STATE OF MARYLAND; STATE OF NEW YORK; and STATE OF WISCONSIN,

*Plaintiffs-Appellees,*

v.

U.S. DEPARTMENT OF EDUCATION; DENISE CARTER, in her official capacity as former Acting Secretary of Education and current acting Chief Operating Officer; LINDA MCMAHON, in her official capacity as Secretary of Education,

*Defendants-Appellants,*

On Appeal from an Order of the United States District Court
for the District of Massachusetts (Joun, J.) in No. 25-10548-MJJ

# APPELLEES' OPPOSITION TO
# APPELLANTS' MOTION FOR STAY

## TABLE OF CONTENTS

Introduction .................................................................................................1

Statement ....................................................................................................2

    A.    Legal and factual background ...........................................2

    B.    Proceedings below...............................................................6

Argument.....................................................................................................7

I.     The Court lacks jurisdiction over defendants' appeal ...................7

II.    Defendants do not meet the standard for a stay pending appeal ....9

    A.    Defendants have not demonstrated irreparable injury ........10

    B.    Defendants' merits arguments are unlikely to succeed on appeal ......12

        1.    Plaintiffs are likely to succeed on the merits of their APA claims ................................................................12

        2.    Defendants' remaining merits-related arguments are misguided ...................................................17

        3.    The TRO is appropriate in scope ...........................20

    C.    The balance of equities and public interest do not support a stay ......21

Conclusion ................................................................................................24

**INTRODUCTION**

There is nothing "regular" (Mot. 17) about the conduct that gave rise to this litigation. Congress enacted two competitive grant programs to address alarming shortages of teachers in many parts of our country. In early February, the Department of Education abruptly terminated substantially all of the grants previously awarded under those programs, including to recipients in Plaintiff States.[1] It did so without any advance notice or public announcement. It notified many (but not all) of the grantees via a cryptic form letter that offered multiple, unrelated potential rationales for the termination. Defendants' sudden and opaque termination of the existing grants left the Plaintiff States scrambling to ascertain what had happened. The Plaintiffs worked to assemble the facts and file a 51-page complaint and a motion for a temporary restraining order with supporting exhibits. The district court entered a time-limited TRO and set a schedule under which the preliminary injunction motion will be fully briefed by the end of next week, with a hearing the following week.

The district court acted appropriately. It correctly held that defendants' actions likely violate the Administrative Procedure Act because (among other things) the cursory and confusing explanation the Department provided for its

---

[1] A Department official stated on February 21 that "[a]ll the grants have been terminated." ECF 8-13 at 6, 60. Defendants now assert that they terminated 104 out of 109 awarded grants. Mot. 4; *see* App. 16.

sudden change in policy was not reasonably explained and failed to consider the reliance interests of grantees and prospective teachers in receiving the grants they had been awarded. And it correctly recognized that the equitable factors tilt decisively in favor of preserving the status quo during the short period while the parties litigate the preliminary injunction motion. Defendants' allegations that the Plaintiff States have engaged in gamesmanship or will use the TRO to withdraw the entire remaining balances on their grants are unfounded. Grant recipients generally draw down funds on a reimbursement model, and are subject to federal regulations as well as payment rules incorporated in their grant awards. It is defendants who have engaged in irregular conduct: by upending congressionally-enacted grant programs, obscuring the rationale for their action, and purporting to file an appeal from a time-limited TRO that is not an appealable order. The motion for a stay pending appeal should be denied.

## STATEMENT

### A. Legal and Factual Background

1. This case concerns two competitive federal grant programs established by Congress. The Teacher Quality Partnership (TQP) program supports teacher preparation programs for highly qualified individuals at institutions of higher education. 20 U.S.C. § 1022. Congress directed that TQP grants "shall be awarded for a period of five years." *Id.* § 1022b(a). It authorized the Secretary of

Education to award grants to "eligible partnerships"—between high-need local educational agencies and institutions of higher education—to carry out programs for teacher preparation, teacher residency, and school leader preparation. *Id.* §§ 1021(6); 1022a(a), (c)(1).

The Supporting Effective Educator Development (SEED) grant program "support[s] the implementation of Evidence-Based practices that prepare, develop, or enhance the skills of educators."[2] Congress directed that SEED grants must be initially awarded for a period of not more than three years, but authorized the Secretary to renew grants for an additional two-year period. 20 U.S.C. § 6672(b)(1)-(2). The "Secretary shall award grants, on a competitive basis, to eligible entities" for five purposes, including providing professional development and nontraditional teacher preparation and certification pathways to serve in traditionally underserved communities. *Id.* § 6672(a)(1)-(5). Congress also required the Secretary to "ensure that, to the extent practicable, grants are distributed among eligible entities that will serve geographically diverse areas, including urban, suburban, and rural areas." *Id.* § 6672(b)(3).

---

[2] See U.S. Dep't of Educ., Supporting Effective Educator Development Grant Program, https://www.ed.gov/grants-and-programs/teacher-prep/supporting-effective-educator-development-grant-program.

The priorities for both grant programs must be set by Congress in the authorizing statutes or by the Department through the notice-and-comment rulemaking process. *See* 34 C.F.R. § 75.105; 20 U.S.C. § 1232. The Department published a notice of final priorities for the TQP and SEED programs in 2021. 86 Fed. Reg. 36,217-20 (July 9, 2021); *see also* 86 Fed. Reg. 34,664-74 (June 30, 2021). Grant recipients relied on those priorities in crafting their applications, and the Department relied on them in making competitive selections. *See, e.g.*, 90 Fed Reg. 5845 (Jan. 17, 2025).

In early February 2025, there were dozens of TQP and SEED recipients operating in Plaintiff States. *See* ECF 8. For example, the University of Massachusetts-Amherst received a TQP grant to train paraeducators to become fully licensed early-childhood educators in two districts that have struggled to recruit and retain teachers. *See* ECF 8-1. California State University, Chico received a SEED grant to address a chronic and acute shortage of qualified teachers in rural northeastern California. *See* ECF 8-5.

2. On February 7, the Department began sending boilerplate letters to some, but not all, TQP and SEED grant recipients, customized only for the address, grant award number, and termination date. Those letters informed recipients that their grants had been terminated and recited a disjunctive list of nonspecific potential reasons for termination, without saying which (if any) purportedly applied to a

particular grant recipient:

> The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; *or* that otherwise fail to serve the best interests of the United States. ***The grant is therefore inconsistent with, and no longer effectuates, Department priorities***. See 2 C.F.R. § 200.340(a)(4); see also 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No. [grant award number] in its entirety effective [date of letter].

*E.g.*, ECF 8-1 at 118 (emphasis added). The letters did not offer any evidence that the grant-funded programs engaged in any of the purportedly disqualifying activities.

While the termination letter briefly described an objection process and instituted a 30-day timeline to submit any objections and challenges to the terminations, it did not describe the Department's procedures for processing objections or challenges. *E.g.*, *id.* at 119. Nor did it suggest the availability of any interim relief.

The Department also distributed to most grant recipients a revised Grant Award Notification (GAN) modifying the budget period for the current fiscal year to end in February 2025 on the same date as the termination letter or the GAN was received. *E.g.*, *id.* at 123. Like the letter, the GAN stated: "The grant is deemed

to be inconsistent with, and no longer effectuates, Department priorities." *Id.* at 124. The GAN appears to modify the authorized funding to a prorated amount for the current fiscal year. *See id.* at 123.

### B. Proceedings Below

Plaintiffs filed this suit on March 6, asserting claims under the Administrative Procedure Act. ECF 1. The complaint alleges that defendants' termination of previously-awarded TQP and SEED grants was arbitrary and capricious and was contrary to law. *Id.* at 46-51. Plaintiffs sought a temporary restraining order to preserve the pre-existing status quo for grant recipients in their States while the parties litigated a motion for preliminary injunction. *See* ECF 2.

On March 10, the district court heard oral argument on the TRO motion. ECF 38. Later that day, it issued a TRO. ECF 41 (Order). The court concluded that it has jurisdiction, *id.* at 2-3; that the Plaintiff States are likely to succeed on the merits of their arbitrary-and-capricious claim, *id.* at 3-6; that they established irreparable harm, *id.* at 6-8; and that the balance of hardships and public interest weigh in favor of a TRO, *id.* at 8-9. The court ordered defendants to "immediately restore Plaintiff States to the pre-existing status quo," and it temporarily barred defendants from terminating any previously awarded TQP or SEED grants for recipients in Plaintiff States unless defendants comply with specified conditions.

*Id.* at 9-10.  The court directed that the TRO "shall remain in effect for 14 days" (*i.e.*, until March 24).  *Id.* at 10.

On March 11, defendants filed a notice of appeal with respect to the TRO.  ECF 48.  On March 12—shortly before moving for a stay in this Court—defendants filed a motion in the district court seeking a stay pending appeal.  ECF 54.  The district court promptly directed the Plaintiff States to respond to that motion by 10:00 a.m. on March 13.  ECF 56; *see* ECF 62 (filed opposition).

## ARGUMENT

### I.    The Court Lacks Jurisdiction Over Defendants' Appeal

The "grant of a TRO generally is not appealable."  *Almeida-León v. WM Cap. Mgmt., Inc.*, 2024 WL 2904077, at *4 (1st Cir. June 10, 2024); *accord Calvary Chapel of Bangor v. Mills*, 984 F.3d 21, 27 (1st Cir. 2020).  Although there is an exception for "an injunction masquerading as a TRO," *Almeida-León*, 2024 WL 2904077, at *4, that is not the case here.  The district court entered a TRO days ago—on March 10—and promptly entered an expedited briefing schedule on the motion for a preliminary injunction, under which it will be fully briefed by March 21 and heard on March 28.  ECF 52.

That kind of "temporary and short" order is properly styled as a TRO, not an injunction.  *Almeida-León*, 2024 WL 2904077, at *4.  It is not remotely comparable to the kinds of TROs this Court has treated as appealable injunctions.

*See, e.g.*, *Melanson v. John J. Duane Co.*, 605 F.2d 31, 33 (1st Cir. 1979) (order "continued for three years"); *Societe Generale de Surveillance, S.A. v. Raytheon European Mgmt. & Sys. Co.*, 643 F.2d 863, 864 n.2 (1st Cir. 1981) ("more than a year"). Plaintiffs here seek only to "preserve the status quo" with respect to the grants at issue until the district court rules on their preliminary-injunction motion—the typical function of a TRO. *EEOC v. Steamship Clerks Union, Local 1066*, 48 F.3d 594, 608 n.17 (1st Cir. 1995). Because this Court lacks jurisdiction over an appeal from a TRO, it "necessarily" lacks "authority to grant [the] stay" requested by defendants. *Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Employees, AFL-CIO*, 473 U.S. 1301, 1306 (1985) (Burger, C.J., in chambers).

Defendants' contrary arguments are unpersuasive. They first contend that the district court's order is appealable because it will have the "profound" effect of allowing the plaintiffs to "empty a substantial portion, if not the entire, balances of their accounts at any time" prior to the district court's ruling on the preliminary-injunction motion. Mot. 7. As Plaintiff States explain below, *see infra* pp. 10-12, that concern is unfounded. Defendants next accuse plaintiffs of delaying this lawsuit to "manufacture an emergency [to] 'shield' the district court's order 'from appellate review,'" Mot. 7. But plaintiffs filed this lawsuit within 30 days of receiving the first notices of grant terminations, the same timeframe defendants provided for grantees to object to or challenge the terminations. *See* ECF 1 at 30.

That was a reasonable amount of time to gather facts—which was necessary because of the Department's vague and chaotic rollout—and to prepare a complaint and TRO motion.

Defendants also ask this Court to construe this motion as a petition for writ of mandamus. Mot. 8-9. The Court should not do so. Only "'exceptional circumstances amounting to a judicial usurpation of power, or a clear abuse of discretion, will justify the invocation of this extraordinary remedy.'" *Da Graca v. Souza*, 991 F.3d 60, 64 (1st Cir. 2021). Defendants make no attempt to show that this demanding standard is satisfied here.

## II. Defendants Do Not Meet the Standard for a Stay Pending Appeal

Even if this Court had jurisdiction, defendants are not entitled to a stay pending appeal. A stay applicant must "ma[ke] a strong showing" that (1) it "will be irreparably injured absent a stay"; (2) its appeal will "likely . . . succeed on the merits"; (3) "issuance of the stay will [not] substantially injure the other parties interested in the proceeding"; and (4) the stay would be in "the public interest." *Does 1-3 v. Mills*, 39 F.4th 20, 24 (1st Cir. 2022). "[T]he burden is on the Government as applicant to show" these factors "favor a stay." *Dep't of Educ. v. Louisiana*, 603 U.S. 866, 868 (2024).

## A.      Defendants Have Not Demonstrated Irreparable Injury

Defendants' principal argument regarding irreparable injury is that "recipients in the plaintiff States have the incentive to draw down and spend as much of the remaining $65 million as quickly as possible."  Mot. 19; *see id.* at 18 (the Department would have "limited ability to recover those disbursed funds" if they were to prevail in this litigation); *see also* C.A. No. 25-1244, Order (March 12, 2025).  That concern is unfounded.

As a general matter, TQP and SEED grants operate on a reimbursement basis over a period of years.  Recipients generally submit draw-down requests for expenses that grantees have already incurred.  *See, e.g.*, ECF 8-9 at 7 (explaining how recipient draws down funds for incurred costs, usually on a "monthly basis"), ECF 8-10 at 9 (similar).  Advance withdrawals of grants are generally subject to various restrictions, including the requirement that a State minimize the time elapsing between the transfer of funds from the United States Treasury and the payout of those funds for program purposes.  Shaffer & Ramish, Federal Grant Practice § 33:5; *see also id.* § 32:4 (describing payment principles for non-state recipients); 2 C.F.R. § 200.305(b) (similar); 31 U.S.C. § 6503(a)(2).

The Department is authorized to monitor draw-down activity for all grants.  *See, e.g.*, U.S. Dep't of Educ., Discretionary Grantmaking at ED, at 36, *available*

*at* https://tinyurl.com/3kvfx8cn.[3]  Certain grant recipients, including States or

institutions of higher education, are subject to an annual audit if they expend

$1,000,000 or more in federal awards during a fiscal year.  *Id.* at 37.  If the

Department's monitoring or audit activities reveal that costs are "unallowable," it

may impose various remedies, including ordering repayment, withholding future

funds, or suspending an award.  *Id.* at 38; *see also* 2 C.F.R. § 200.346; 20 U.S.C.

§§ 1234a, 1234c.

The district court's order does not displace any of those limitations on draw

downs.  And there is no basis for defendants' asserted concern that recipients will

improperly rush to deplete grant funds, or that the Department lacks the "ability to

recover" any improperly drawn-down funds.  Mot. 18.  Nor does the order

"obstruct[] the Executive Branch's authority and ability to superintend federal

dollars."  Mot. 19.  The Department may continue to exercise discretion to make

allocation decisions in accordance with its statutory and regulatory authority and

the terms of its grants.  *See* Order 10.  What the Department may not do is

terminate previously-awarded grants on a basis that the district court has concluded

---

[3] Grant Award Notification documents often explain that the Department monitors recipients for "excessive" draw downs during a fiscal quarter.  *E.g.*, ECF 8-10 at 71 (for "purposes of drawdown monitoring, Department will contact grantees who have drawn down more than 50% or more of the grant in the first quarter, 80% or more in the second quarter, and/or 100% of the cash in the third quarter of the budget period").

is likely unlawful.  Order 3-6.  "Continuation of the status quo" while this

expedited litigation proceeds "will not work an irreparable harm" on defendants.

*U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 481 U.S. 1301, 1303

(1987) (Rehnquist, C.J., in chambers).

### B.    Defendants' Merits Arguments Are Unlikely to Succeed on Appeal

#### 1.    Plaintiffs Are Likely to Succeed on the Merits of their APA Claims

The district court correctly concluded that plaintiffs are likely to succeed on

their claim that the grant terminations are arbitrary and capricious in violation of

the APA.  An agency action is arbitrary and capricious if the agency has "relied on

factors which Congress has not intended it to consider, entirely failed to consider

an important aspect of the problem, [or] offered an explanation for its decision that

runs counter to the evidence before the agency, or is so implausible that it could

not be ascribed to a difference in view or the product of agency expertise."  *Motor*

*Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The district court identified two principal ways in which defendants violated

that standard.  First, the termination letters listed "several theoretical bases for the

grant terminations"—that the grants fund programs that "promote or take part in

DEI initiatives" or "are not free from fraud, abuse, or duplication" or "otherwise

fail to serve the best interests of the United States"—but did not "identify which of

these bases applies" to each grant. Order 5. This "does not reach the level of a reasoned explanation; indeed it amounts to no explanation at all." *Id.* Second, "even accepting any one of these bases as justification for the agency action, such as discrimination related to DEI initiatives," the termination letter's explanation is "conclusory" and "reflects a lack of the individualized reasoning and analysis required." *Id.* These defects were "even more egregious in light of the drastic change" from prior policy that the termination letters reflected. Order 6. When such a policy change occurs, an agency must consider and discuss factors such as "factual findings that contradict those which underlay" the prior policy, and any "reliance interests" the "prior policy . . . engendered." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Defendants are not likely to succeed in persuading this Court to reverse. There is no question that TQP and SEED grants engendered significant reliance interests, on the part of grantees as well as prospective teachers entering training programs. It is equally clear that the Department made no effort to take those reliance interests into consideration—much less provide a reasoned explanation for disregarding them. *See* ECF 55-1 ¶¶ 7, 18-20 (describing process of reviewing grants, which includes no mention of reliance interests or the impact of termination). That alone renders the terminations arbitrary and capricious. *See Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (no

reasoned explanation where Government "does not contend" that it "considered potential reliance interests" in making policy change).

The termination letters' invocation of several alternative and unrelated potential bases for the grant terminations also leaves recipients—and reviewing courts—to "guess at the theory underlying the [Department's] action." *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). Regardless of whether the Department undertook individualized consideration of each grant, *see* Mot. 16, the termination letters provide no explanation that allows a grantee to understand why its funding has been terminated.

Defendants now assert that they terminated all the grants at issue because they shared the "common characteristic" of "funding DEI." Mot. 16. But the termination letters do not say that; they list promoting DEI as one of several, unrelated bases for potential termination. Defendants' "*post hoc* rationalization [] for agency action" offered in litigation is insufficient to satisfy the APA's reasoned-explanation requirement. *State Farm*, 463 U.S. at 50; *accord Regents*, 591 U.S. at 21. And even if the termination letters had identified DEI as the reason for each termination, that would still be insufficient because of the amorphous meaning of that term and the failure to explain *how* the grantees' activities "promote or take part in DEI initiatives." Order 5.

In addition, the Department has "relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. Even taking at face value defendants' assertion that they terminated all the grants for "funding DEI," Mot. 16, Congress did not intend for TQP and SEED grants to be terminated on that basis. In enacting these programs, Congress sought to recruit "individuals from under[-]represented populations" into teaching. 20 U.S.C. § 1022a(d)(5)(A). Congress also specified that the programs should prepare teachers for schools in "traditionally underserved" communities, *id.* § 6672(a)(1); that teachers should "reflect the communities in which they will teach," *id.* § 1022a(e)(2)(A)(vi)(II); and that funding should train instructors for "diverse populations, including children with disabilities, limited English proficient students, and children from low-income families," *id.* § 1022e(b)(4). While defendants are free to arrive at a "policy determination" that "funding programs involving DEI is not in the Department's interests," Mot. 17, they are not free to ignore statutory provisions enacted by Congress to promote diversity, equity, and inclusion goals.

Because the district court determined that Plaintiff States were likely to succeed on the merits of their arbitrary-and-capricious claim, it did not reach the separate claim that the grant terminations were "not in accordance with law." 5 U.S.C. § 706(2)(A); *see* Order 6 n.3. But Plaintiff States are likely to succeed on

that claim as well, which provides additional support for allowing the TRO to remain in effect while the district court rules on the preliminary injunction motion.

The Department has invoked 2 C.F.R. § 200.340(a)(4), which states that an agency under certain circumstances may terminate an award that "no longer effectuates the program goals or agency priorities." *See also* 89 Fed. Reg. 30089. Among other things, this clause does not authorize an agency to *change* program goals or agency priorities in the middle of an existing grant term. Specific priorities set through regulation are identified in the application for each competitive federal grant program. 34 C.F.R. § 75.105(b)(1); *see also* 20 U.S.C. § 1232(d). Grant recipients rely on those previously established priorities in crafting their applications, and the Department itself uses those priorities in deciding which particular grant projects fulfill those priorities and should be funded.

While the Department may set new policy priorities for future grant cycles, it has no authority to do so midstream for existing grants. The "no longer effectuates" language in Section 200.340(a)(4) was added to the regulations in 2020, and contemporaneous guidance explained that it was designed to enhance agencies' ability to terminate grants in cases where grantees' poor performance was failing to effectuate agency priorities. *See* 85 Fed. Reg. 49,506, 49,507 (Aug. 13, 2020). Neither Section 200.340(a)(4) nor any other provision of law allows the

Department to terminate existing grants based on *new*, previously unannounced

policy priorities.

## 2. Defendants' Remaining Merits-Related Arguments Are Misguided

Defendants two remaining merits-related arguments also fail.

First, the district court properly rejected (Order 2-3) defendants' contention

that the Tucker Act vests exclusive jurisdiction in the Court of Federal Claims. *See*

Mot. 9-12. In assessing whether the Tucker Act precludes district court

jurisdiction, courts consider "both . . . the source of the rights upon which the

plaintiff bases its claims, and . . . the type of relief sought (or appropriate)."

*Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Here, Plaintiffs

base their claims on federal regulations, the statutes authorizing these grant

programs, and the APA—not on the grants themselves. The fact that a court may

consider the language of a contract as part of its analysis does not convert the claim

to one whose "essence" is a contract claim. *Id.* at 969-70. As for the type of relief

sought, Plaintiffs are seeking vacatur of the Department's blanket termination

decision, as well as declaratory and injunctive relief returning the parties to the

status quo before termination. *See* ECF 1 at 51-52. Ultimately, this "is not a suit

seeking money in *compensation* for the damage sustained by the failure of the

Federal Government to pay as mandated; rather, it is a suit seeking to enforce the

statutory [and regulatory] mandate itself." *Bowen v. Massachusetts*, 487 U.S. 879,

900 (1988). The district court was thus correct to follow the recent decision in

*Massachusetts v. Nat'l Insts. of Health*, 2025 WL 702163 (D. Mass. Mar. 5, 2025),

which likewise found the Tucker Act inapplicable even though the case involved

federal grants.[4]

Second, defendants contend that the Department's grant-termination

decision cannot be subject to arbitrary and capricious review because it purportedly

concerns a matter "committed to agency discretion by law." Mot. 12. But the

Supreme Court has construed the APA's exception for action committed to agency

discretion "quite narrowly"—limiting it to the "rare circumstances" in which a

court would have "no meaningful standard against which to" review an agency's

discretionary action. *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019). This

is not one of those rare circumstances.

Defendants rely primarily on *Lincoln v. Vigil*, 508 U.S. 182 (1993). But

"*Lincoln* addressed lump-sum appropriations" (Mot. 14), not competitive grants.

And the Supreme Court recognized that "Congress may always circumscribe

agency discretion to allocate resources by putting restrictions in the operative

statutes." *Lincoln*, 508 U.S. at 193. Courts following *Lincoln* have thus reviewed

---

[4] To the extent defendants believe the district court's analysis was "insufficiently
explained," lacks "elaboration," or failed to cite certain statutes and regulations
(Mot. 9, 11-12), those criticisms only highlight that the order bears the hallmarks
of a non-appealable TRO. *See supra* pp. 7-9.

grant-related decisions where Congress—or the implementing agency—cabined the agency's "discretionary funding determinations." *E.g.*, *Pol'y & Res., LLC v. U.S. Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 76 (D.D.C. 2018) (Jackson, J.) (grant termination was reviewable where agency's regulations limited its discretion to terminate).

The relevant question is whether a statute, regulation, or other binding policy provides a "meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com.*, 588 U.S. at 772; *see also Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 19 (1st Cir. 2020). Meaningful standards exist here because the Department has adopted OMB's Uniform Guidance for Federal Financial Assistance, which provides enumerated grounds on which an agency may terminate a grant award. *See* 2 C.F.R. § 200.340(a); *id.* § 3474.1. Defendants do not even address the Uniform Guidance.

Defendants assert that the Department enjoys "significant discretion in determining how best to allocate appropriated funds across grant applicants." Mot. 14. But this case concerns the termination of grants *already awarded* to specific recipients. And whatever discretion the Department may enjoy when awarding *new* grants, defendants have not shown that it enjoys unreviewable discretion to terminate existing grants.

### 3.     The TRO Is Appropriate in Scope

Defendants' arguments (at 19-21) concerning the scope of the TRO are also unpersuasive. The district court temporarily suspended the termination of TQP or SEED grants for "recipients in" the geographic bounds of the "Plaintiff States." Order 9. Defendants contend that the inclusion of certain grantees that are not instrumentalities of the State "violates" the "principle that relief must be limited to redressing the specific plaintiff's injury." Mot. 20. But the order validates that principle by recognizing that the termination of funding to non-state recipients providing a pipeline of public-school teachers within Plaintiff States directly harms the States. Congress designed TQP and SEED grants to prepare teachers to serve in high-need schools and subject areas. Without a pool of TQP- or SEED-trained educators for public schools, the Plaintiff States' own institutions would be required to expend public funds to conduct that training—or suffer the obvious public harms resulting from a scarcity of qualified teachers within the State. *See, e.g.*, ECF 8-13 at 7-8, ¶¶ 24-26; Ill. Const. art. X, § 1. The order is thus "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Defendants also suggest (at 20-21) that the traditional remedy for the "specific harm identified by the court" following judicial review would be an order preventing the Department from relying on the flawed agency action or a remand

to the agency.  Even accepting that general principle, however, the court retains equitable authority to grant provisional relief while it considers the merits of the APA claim.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Finally, the court's order does not "prohibit[] the government from re-terminating grants in plaintiff States with a new explanation."  Mot. 21.  The order expressly *preserves* defendants' authority to "terminat[e] any individual TQP and SEED grant" to the extent consistent with law.  Order 10.

### C.    The Balance of Equities and Public Interest Do Not Support a Stay

Defendants have also failed to establish that the "the balance of equities and the public interest" favor a stay.  *Dist. 4 Lodge v. Raimondo*, 18 F.4th 38, 47 (1st Cir. 2021).  On the contrary, because a stay will "substantially injure the other parties interested in the proceeding," *Nken v. Holder*, 556 U.S. 418, 426 (2009)— the Plaintiff States and their residents—the district court correctly determined that these factors support temporary relief.  Order 6-9.

"[T]here is ample evidence that the Department's termination of all previously awarded TQP and SEED grants has already harmed, and will continue to harm, the programs and employees of those programs that rely on these grants." Order 7.  For example, the loss of funding has already disrupted a teacher preparation program at California State University to develop teachers for "high-need or high-poverty urban K-12 schools," with an emphasis on "special

education" programs, *id.*; the College of New Jersey "was forced to cancel the remainder of its urban teacher residency program," *id.*; and "the abrupt termination" of a TQP grant in Massachusetts "has resulted in the loss of three full-time employees," *id.*

Defendants do not dispute that these harms have occurred, and they acknowledge that a "total of $65 million remains outstanding under the relevant grant awards." Mot. 18. Defendants argue instead "that, if plaintiffs ultimately prevail, they will receive the funds, to the extent required by law." *Id.* As the district court correctly recognized, however, "a later-issued permanent injunction or damages remedy cannot compensate for such loss of federal funding." Order 8. The "terminations have 'upended months, if not years' of work required to implement programs that rely on these grants"; have "impacted 'budgets for staff, coursework, partner organizations, school districts, and student populations'"; and have affected "existing projects or projects already in progress." *Id.*

Defendants contend (at 18) that Plaintiffs' "lack of urgency" in filing suit undermines those assertions of harm. But the one-month period between the first termination notice and this suit is nowhere near the delay of "more than a year" that "detract[ed] from [the] movant's claim of irreparable harm" in the case they invoke. *Charlesbank Equity Fund II v. Blinds to Go,* 370 F.3d 151, 163 (1st Cir. 2004). More importantly, the argument overlooks how defendants' chaotic rollout

of the terminations caused substantial confusion that required investigation by Plaintiffs.

In contrast, the TRO requires defendants only to disburse previously-awarded "funds that Congress has appropriated to the States and others." Order 9. And defendants' argument (at 18) that recipients will improperly "deplete most or all of the remaining grant funds" is unsubstantiated. *Supra* pp. 10-12.

# CONCLUSION

This Court should deny the motion for a stay pending appeal.

March 13, 2025                                    Respectfully submitted,

**ANDREA JOY CAMPBELL**                           **ROB BONTA**
*Attorney General*                                *Attorney General*
Commonwealth of Massachusetts                     State of California

By: */s/ Adelaide Pagano*                         By: */s/ Christopher D. Hu*
Megan Barriger (1168315)                          Michael J. Mongan
*Senior Trial Counsel*                            *Solicitor General*
Adelaide Pagano (1168413)                         Helen H. Hong
*Assistant Attorney General*                      *Principal Deputy Solicitor General*
Yael Shavit                                       Christopher D. Hu (1215738)
*Chief, Consumer Protection Division*             Joshua Patashnik (1215775)
David Kravitz (41870)                             *Deputy Solicitors General*
*State Solicitor*                                 Michael Newman
Chris Pappavaselio                                *Senior Assistant Attorney General*
Matthew Lindberg (1195925)                        Laura L. Faer
*Assistant Attorneys General*                     *Supervising Deputy Attorney General*
1 Ashburton Pl.                                   Alexis Piazza
Boston, MA 02108                                  Heidi Joya
(617) 963-2038                                    Garrett Lindsey
                                                  *Deputy Attorneys General*
                                                  455 Golden Gate Avenue
                                                  San Francisco, CA 94102
                                                  (415) 510-3917

**MATTHEW J. PLATKIN**
*Attorney General*
State of New Jersey

By: */s/ Elizabeth Walsh*
Lauren E. Van Driesen
Elizabeth R. Walsh (1215673)
*Deputy Attorneys General*
Stephen Ehrlich
*Deputy Solicitor General*
Lauren E. Van Driesen
*Deputy Attorney General*
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5279

**KWAME RAOUL**
*Attorney General*
State of Illinois

By: */s/ Darren Kinkead*
Darren Kinkead
*Public Interest Counsel*
Sarah A. Hunger
*Deputy Solicitor General*
115 South LaSalle Street
Chicago, IL 60603
(773) 590-6967

**PHILIP J. WEISER**
*Attorney General*
State of Colorado

By: */s/ David Moskowitz*
David Moskowitz
*Deputy Solicitor General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000

**ANTHONY G. BROWN**
*Attorney General*
State of Maryland

By: */s/ Virginia A. Williamson*
Virginia A. Williamson†
*Assistant Attorney General*
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6584

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

By: */s/ Aaron J. Bibb*
Aaron J. Bibb
*Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0810

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g)(1), I certify that:

1. This document complies with the type-volume limitations of Fed. R. App. P. 27(d)(2)(A) because, excluding parts of the document exempted by Fed. R. App. P. 32(f), the brief contains 5,150 words and thus does not exceed the 5,200-word limit.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using the Microsoft Word word-processing system in Times New Roman that is at least 14 points.

/s/   Christopher D. Hu
Christopher D. Hu
Deputy Solicitor General

Dated: March 13, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on March 13, 2025, I electronically filed the foregoing opposition to appellants' motion to stay with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/   Christopher D. Hu
Christopher D. Hu
Deputy Solicitor General