**No. 25-1244**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

State of California, *et al.*,

*Plaintiffs-Appellees*,

v.

U.S. Department of Education, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Massachusetts

# REPLY IN SUPPORT OF EMERGENCY MOTION FOR STAY PENDING APPEAL AND IMMEDIATE ADMINISTRATIVE STAY

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

LEAH B. FOLEY
  *United States Attorney*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

## INTRODUCTION

The district court entered a quintessential "injunction masquerading as a TRO" that immediately compels the government to restore many millions of dollars of grants, inflicting potentially irreversible consequences and forcing the government to continue programs against its will. *See Almeida-Leon v. WM Capital Mgmt., Inc.*, 2024 WL 2904077, at \*4 (1st Cir. June 10, 2024).

That order "temporarily enjoin[ing]" grant terminations, App.9-10, is not just appealable but manifestly reversible. Black-letter law establishes that the district court here lacked jurisdiction, because a claim based on a contract must be brought in the Court of Federal Claims. Moreover, funding decisions are committed to agency discretion by law. And the government is plainly entitled to change policy direction and to apply its new position when deciding, on a case-by-case basis, whether to exercise its authority to terminate grants that no longer serve the agency's priorities.

The district court's contrary decision to assert jurisdiction and enjoin the termination of dozens of contracts as arbitrary and capricious under the APA is indefensible. Plaintiffs note that contract terminations must comply with applicable statutes and regulations—but that has nothing to do with the ostensible APA claim at issue here. And plaintiffs deny that their claims are premised on contracts, but nothing else could conceivably require the government to make the monetary payments that the district court ordered.

As to the nonmerits factors, plaintiffs provide no satisfactory explanation of why they should be entitled to wait for weeks to institute a lawsuit and then secure an order mandating the immediate payment of funds without any review by this Court. Even without immediate relief, plaintiffs could recover any monies to which they are lawfully entitled in an appropriate forum in due course. Conversely, the order requires the government to spend—likely irreversibly—millions of taxpayer dollars. And although plaintiffs now emphasize that, in their view, the government can permissibly apply restrictions on unusually large draw-downs, the district court's order does not unambiguously permit the government to apply even ordinary controls to withhold funds. At a minimum, this Court should clarify that the Department may use such normal payment-system protections—including withholding payments that the Department's system flags as unusually large.

## ARGUMENT

### A. This Court Is Likely to Reverse

1. In declining to grant a stay pending appeal, the district court concluded that this Court likely lacked jurisdiction to review its order, Dkt. No. 66, and plaintiffs repeat (at 7-9) that erroneous conclusion.

Plaintiffs and the district court are wrong that the order merely preserves the status quo. Instead, the order requires the government to make funds available to grantees, which grantees may spend and which the government may not recover even if it ultimately prevails in this suit. That order alters—likely irreversibly—the status

2

quo, rather than preserving it. That the order is currently set to expire after 14 days should not immunize it from judicial review. As the government explained (at 8), the duration of the order is of little relevance here, because grantees may draw down funds irreversibly. And, even on plaintiffs' telling, the district court is unlikely to rule on plaintiffs' preliminary injunction motion until well after the default 14-day TRO period.

Moreover, plaintiffs ignore other indicia of appealability. The district court held an adversarial hearing before entering relief. And plaintiffs offer no satisfactory explanation for the fact that they waited a month to bring this suit before demanding relief in days. Plaintiffs' only response is that they needed time "to gather facts" and "to prepare a complaint and TRO motion." Opp.9. Fair enough—but having taken a month for their own purposes, plaintiffs cannot reasonably contend that the need for relief is so immediate that the district court must force the government to release funds within days, without full briefing or the opportunity for appellate review. This self-created emergency should not bar this Court's jurisdiction.

Finally, plaintiffs do not contest (at 9) that this Court may, in the alternative, properly treat the government's motion as a petition for a writ of mandamus. The standards for that relief are satisfied here.

2. Compelling the government to expend millions of dollars when the court lacks jurisdiction is a particularly strong ground for reversal. And here, plaintiffs cannot show that this case was properly before the district court. *See* Mot.9-12.

3

Plaintiffs dispute neither that essentially contractual claims belong in the Court of Federal Claims, nor that the grants at issue here are essentially contracts. Plaintiffs contend only (at 17-18) that their claims are not based "on the grants themselves" and that they seek "vacatur" and "injunctive relief" rather than compensation. Those contentions are misguided.

Plaintiffs assert (at 17) their claims are founded on "federal regulations" and "statutes," but the district court cited only the APA. Plaintiffs cannot smuggle every contract claim into district court merely by deeming the challenged contract termination "arbitrary and capricious." Mot.11-12. Plaintiffs offer no response.

Plaintiffs also cannot escape that their claims raise disputes under and about contracts. *See* Mot.11. The grants themselves, not any statute or regulation, give rise to any obligation to pay. The argument that the grants were improperly terminated boils down to an argument that the government failed to hold up its end of the bargain because it violated the grants' terms (including statutory, regulatory, and guidance provisions incorporated into the grants, *see San Juan City College v. United States*, 391 F.3d 1357, 1360 (Fed. Cir. 2004)). To avoid that conclusion, plaintiffs mistakenly suggest that they seek "vacatur of the Department's blanket termination decision." Opp.17. As the government has explained and as plaintiffs do not meaningfully contest, however, there has been no "blanket termination decision." Instead, the Department has individually terminated a series of specific grants, which shared a common flaw. *See* Mot.3-4. There is thus no blanket policy to vacate.

4

"Stripped of its equitable flair," plaintiffs' "requested relief seeks one thing": plaintiffs "want[] the Court to order the Government to stop withholding the money due under" the grants—the "classic contractual remedy of specific performance." *U.S. Conference of Catholic Bishops v. U.S. Dep't of State*, 1:25-cv-465, 2025 WL 763738 (D.D.C. Mar. 11, 2025) (quotation omitted). The district court thus lacked jurisdiction. *Cf. Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 4 (1st Cir. 1989).

3. Plaintiffs independently cannot succeed on the merits because no court may hear the only claim on which the district court granted relief. As the government explained, the decision how to allocate funds across a discretionary spending program is committed to agency discretion by law. Although that decision may be subject to review (in the appropriate forum) for compliance with the governing statutes, regulations, and funding instruments, it is not subject to review under the APA's reasoned-decisionmaking requirements. *See* Mot.12-15.

Plaintiffs respond that *Lincoln v. Vigil*, 508 U.S. 182 (1993), concerned lump-sum appropriations, "not competitive grants." Opp.18. But they identify no reason why *Lincoln*'s logic does not apply equally to discretionary grant programs, much less explain why the numerous cases so concluding are wrongly decided. *See* Mot.13-15.

Nor is there any basis for plaintiffs' proposed distinction (at 19) between grant *awards* and grant *terminations*. Indeed, *Lincoln* itself involved the decision to discontinue a funding program. *See* 508 U.S. at 185-88. And judicial oversight of discretionary terminations would encounter the same problems as oversight of discretionary

5

awards, because the regulatory framework generally allows terminations for the same discretionary policy reasons that might drive allocations in the first place.

Plaintiffs' observation that the Department's termination decisions are subject to review for consistency with "statute, regulation, or other binding policy," Opp.19, only highlights the incompatibility of plaintiffs' arguments with the district court's decision, which identified no such statute, regulation, or binding policy. Hypothetical review on a different theory cannot rescue the court's flawed order.

And even if this Court were inclined to review plaintiffs' claims in the first instance, plaintiffs misunderstand the sole regulation they cite, 2 C.F.R. § 200.340(a)(4). As plaintiffs admit, that regulation "states that an agency under certain circumstances may terminate an award that 'no longer effectuates the program goals or agency priorities.'" Opp.16. The terminations here did precisely that. Plaintiffs' contrary argument—and their related argument about reliance interests, Opp.13—is premised on their mistaken view that the agency may not "*change* program goals or agency priorities in the middle of an existing grant term." Opp.16-17. That restriction appears nowhere in the regulatory text, and plaintiffs cite no authority suggesting that the Department is required to maintain the same policy priorities over the multiple years that grants are in effect. It would be extraordinary if a new Administration could not, consistent with applicable law, assess ongoing government spending to ensure alignment with the President's priorities.

4. In any event, plaintiffs' defense (at 12-15) of the district court's sole merits holding fails to rehabilitate the errors that the government identified. *See* Mot.15-17. Plaintiffs repeat the district court's conclusion that the termination letters did not provide a reasoned explanation but do not dispute that the APA requires only that the reasoned explanation appear in the administrative record—not in the letters. Mot.16-17. Yet the district court did not request, let alone review, the administrative record.

Plaintiffs are also wrong (at 14) that the letters invoked "alternative and unrelated potential bases for termination." The bases are related variations of the conclusion that the grants "support[ed] programs or organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives or any other initiatives that unlawfully discriminate." App.4. These include, for example, that programs in question "promote or take part in DEI initiatives" or "conflict with the Department's policy of prioritizing merit, fairness, and excellence." App.4-5.

Plaintiffs fare no better in suggesting (at 13-14) that the termination letters fail to explain the government's change in positions. All the APA requires for a policy change unconnected to factual findings is that an agency "display awareness that it *is* changing position," *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), and the suggestion that the Department was unaware that it was changing position with regard to DEI programs beggars belief.

Plaintiffs' argument (at 15) that the termination decisions are arbitrary and capricious because Congress "did not intend for TQP and SEED grants to be

7

terminated" for funding DEI programs is equally unpersuasive. This is (again) not the ground on which the district court ruled. And regardless, plaintiffs nowhere explain how the statutory purposes they identify—such as "prepar[ing] teachers for schools in 'traditionally underserved' communities" and "train[ing] instructors for 'diverse populations,'" Opp.15—require that the *programs themselves* incorporate the DEI activities that formed the basis for the terminations. The policy objection was to the specifics of the programs and not the congressional purposes. *See* App.15.

Finally, plaintiffs do not dispute that the proper remedy in an APA case would be "an order preventing the Department from relying on the flawed agency action or a remand to the agency." Opp.21-22. Their suggestion that the court may issue broader monetary relief as an interim matter is extraordinary. They cite no authority for the counterintuitive proposition that plaintiffs may obtain vastly broader *provisional* relief than plaintiffs could obtain on final judgment—not least when, as here, the "provisional relief" requires the government to expend taxpayer funds that it may never recover.

### B. The District Court's Order Should be Stayed

1. The balance of harms and the public interest support a stay. Plaintiffs' concession that the Department has "discretion to make allocation decisions in accordance with its statutory and regulatory authority and the terms of its grants," Opp.11, underscores the acute separation-of-powers issues with the district court's

8

decision to force the Department to continue funding grants it has determined to be contrary to its policy objectives and priorities. *See* Mot.19.

Nor do plaintiffs dispute (at 22) that they will receive any funds to which they are legally entitled if they succeed in litigation; rather, they take issue with the timing of receiving payments. But plaintiffs never claim that they lack the ability to front the money for the training programs covered by the grants. They suggest the opposite in stating that "the [p]laintiff States' own institutions would be required to expend public funds to conduct that training" in the meantime. Opp.20. The upshot is that plaintiffs' harms are pecuniary in nature and can be remedied after the fact if they are able to prove their case in the ordinary course. *See* Mot.17-18.

In contrast, the government faces irreparable harm. The parties agree (Opp.10) that, under the district court's order, recipients in the plaintiff States will likely draw down money to perpetuate their grant programs; that was the whole point of this litigation. While the government has mechanisms to recoup monies that are expended *unlawfully*, plaintiffs would presumably dispute that funds expended per the grant's terms while the termination has been enjoined would fall in that category.

Plaintiffs try to downplay the *amount* of the harm. As they note (at 10), applicable regulations provide that any requests for advance payments by States and other recipients "must be limited to the minimum amounts needed and be timed with actual, immediate cash requirements." 2 C.F.R. § 200.305(b)(1); 31 C.F.R. § 205.11(b). Those regulations still leave open the possibility that recipients in the plaintiff States

9

could exercise whatever flexibility they have under their grants to incur costs earlier than they otherwise would to be able to draw down the balances of their accounts. The district court's order, while in force, encourages such behavior. *See* Mot.18-19.

Plaintiffs' arguments (at 10) about what "generally" or "usually" happens ignore that the court's time-limited order changes the incentives. Plaintiffs never represent that all of the grantees covered by the order will not seek to draw down unusually large amounts of funds. And while plaintiffs are correct that there are mechanisms to limit excessive draw-downs, neither the district court nor plaintiffs have made clear how the district court's injunction against "suspen[ding] or withholding" grant funds, App.9, affects those mechanisms. At a minimum, this Court should clarify that the Department may continue using normal safeguards against unusually large payment requests, including automatic flagging and temporary withholding pending investigation. Regardless, all of this goes only to *how much* of the grant funds will likely be irrecoverably spent absent relief; the government will undoubtedly incur at least *some* irreparable harm.

2. The extraordinary breadth of the district court's order also justifies a stay. The court's order improperly extends beyond the plaintiff States or State-controlled entities to all manner of third parties who happen to be located within the plaintiff States but who are not plaintiffs themselves. Mot.19-21.

Plaintiffs' defense of the order's breadth fails. Speculative and indirect injuries—such as the possibility that without relief to nonparties the plaintiff States

10

will "expend public funds" to train teachers or will "suffer the obvious public harms resulting from a scarcity of qualified teachers within the State," Opp.20—are insufficient to establish Article III standing, let alone the sort of harm required to support an injunction. A State's choice to expend its own funds on a program that the federal government does not wish to fund is not a cognizable injury; it is federalism. *Cf. United States v. Texas*, 599 U.S. 670, 676-77 (2023). And the States' fears about a lack of qualified teachers reflects only "hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013).

## CONCLUSION

For the foregoing reasons and those in the government's motion, the Court should grant a stay pending appeal or, at a minimum, limit the district court's overbroad relief.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

LEAH B. FOLEY
  *United States Attorney*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY

*/s/ Sean R. Janda*
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

MARCH 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing reply complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(C) because the reply contains 2591 words. The reply complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 2016 in proportionally spaced 14-point Garamond typeface.

/s/ *Sean R. Janda*
SEAN R. JANDA

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2025, I electronically filed the foregoing reply with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

                                                */s/ Sean R. Janda*
                                                SEAN R. JANDA