# United States Court of Appeals
## For the First Circuit

―――――――――――

No. 25-1244

STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEW
JERSEY; STATE OF COLORADO; STATE OF ILLINOIS; STATE OF MARYLAND;
STATE OF NEW YORK; STATE OF WISCONSIN,

Plaintiffs, Appellees,

v.

U.S. DEPARTMENT OF EDUCATION; LINDA MCMAHON, in her official
capacity as Secretary of Education; DENISE CARTER, in her
official capacity as Acting Chief Operating Officer for Student
Aid,

Defendants, Appellants.

―――――――――――

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Myong J. Joun, U.S. District Judge]

―――――――――――

Before

Gelpí, Kayatta, and Montecalvo,
Circuit Judges.

―――――――――――

Yaakov M. Roth, Acting Assistant Attorney General, Leah B.
Foley, U.S. Attorney, Eric D. McArthur, Deputy Assistant Attorney
General, Mark R. Freeman, Daniel Tenny, Sean R. Janda, and Brian
J. Springer, Attorneys, Appellate Staff, U.S. Department of
Justice, on brief for appellants.
Rob Bonta, Attorney General of California, Michael J. Mongan,
Solicitor General, Helen H. Hong, Principal Deputy Solicitor
General, Christopher D. Hu, Joshua Patashnik, Deputy Solicitors
General, Michael Newman, Senior Assistant Attorney General, Laura
L. Faer, Supervising Deputy Attorney General, Alexis Piazza, Heidi

Joya, Garrett Lindsey, Deputy Attorneys General, Andrea Joy Campbell, Attorney General of Massachusetts, Megan Barriger, Senior Trial Counsel, Adelaide Pagano, Assistant Attorney General, Yael Shavit, Chief of Consumer Protection Division, David Kravitz, State Solicitor, Chris Pappavaselio, Matthew Lindberg, Assistant Attorneys General, Matthew J. Platkin, Attorney General of New Jersey, Lauren E. Van Driesen, Elizabeth R. Walsh, Deputy Attorneys General, Stephen Ehrlich, Deputy Solicitor General, Philip J. Weiser, Attorney General of Colorado, David Moskowitz, Deputy Solicitor General, Kwame Raoul, Attorney General of Illinois, Darren Kinkead, Public Interest Counsel, Sarah A. Hunger, Deputy Solicitor General, Anthony G. Brown, Attorney General of Maryland, Virginia A. Williamson, Assistant Attorney General, Joshua L. Kaul, Attorney General of Wisconsin, Aaron J. Bibb, Assistant Attorney General, on brief for appellees.

---

March 21, 2025

---

KAYATTA, **Circuit Judge**.  Concerned that there are too few qualified teachers and principals in various communities, Congress directed the Secretary of Education (the "Secretary") to use certain funds to make grants to entities providing, among other things, for the recruitment and training of teachers and school leaders for traditionally underserved local educational agencies. 20 U.S.C. §§ 1022, 1022a, 6671(1), 6672(a).  After conducting a competitive application process, the Secretary awarded, as relevant here, 109 grants for Teacher Quality Partnership (TQP) and Supporting Effective Educator Development (SEED) programs, which in large part were up and running until the agency action that gave rise to this litigation.

On February 7, 2025, or shortly thereafter, 104 of those 109 programs received boilerplate letters from the U.S. Department of Education (collectively with other appellants, the "Department") purporting to terminate their grants midstream.  The letters stated in pertinent part:

> The grant specified above provides funding for programs that promote or take part in [diversity, equity, and inclusion (DEI)] initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve

the best interests of the United States.  The grant is therefore inconsistent with, and no longer effectuates, Department priorities.

As the careful reader will note, the letters do not specify why any given program is no longer "[]consistent with" and no longer "effectuates[] Department priorities."  Rather, the letters list in the disjunctive five possible reasons.

Presented with a complaint by eight states (the "States") within which operate numerous affected grant recipients, the district court issued a temporary restraining order (TRO) requiring the Department to, among other things, restore the status quo as it stood prior to the purported terminations.  The Department has since appealed the TRO.  It also now asks us to stay the district court's order pending the resolution of this appeal.  This opinion concerns only that motion for a stay pending appeal.  We deny that motion for the following reasons.

## I.

As a preliminary matter, the States claim that we lack appellate jurisdiction to review a TRO.  See 28 U.S.C. § 1291 (confining federal appellate jurisdiction largely to the review of lower courts' final decisions); Calvary Chapel of Bangor v. Mills, 984 F.3d 21, 27 (1st Cir. 2020) (stating that appellants carry the burden of demonstrating TRO reviewability).  "[T]he denial of a [TRO] does not normally fall within the compass of [§] 1292(a)(1)" and so generally is not immediately reviewable.  Calvary Chapel,

984 F.3d at 27.  Nevertheless, in this instance the district court orally heard the Department on at least some of the central issues prior to issuing the TRO.  See Sampson v. Murray, 415 U.S. 61, 87–88 (1974) (treating a purported TRO as a preliminary injunction for reviewability purposes in part because "an adversary hearing ha[d] been held").  In any event, our precedent allows us to assume statutory jurisdiction when the party asserting it will not obtain its requested relief even were there jurisdiction.  See United States v. Pedró-Vidal, 991 F.3d 1, 4 (1st Cir. 2021).  We therefore opt to sidestep the arguable statutory jurisdictional defect at least for the purposes of addressing the motion to stay pending appeal.

## II.

In assessing the merits of the motion to stay pending appeal, we consider four factors: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  Nken v. Holder, 556 U.S. 418, 426 (2009) (citation omitted).  "The first two factors . . . are the most critical."  Id. at 434.

**A.**

As to the first factor, our discussion at this point assesses only the likelihood of success on the merits as the record now stands and does not constitute a holding on the merits.

We begin with two challenges by the Department to the district court's ability to review the termination of the grants.

**1.**

First, the Department claims that the district court itself lacked jurisdiction to entertain this lawsuit, which the Department argues belongs in the Court of Federal Claims. See 28 U.S.C. § 1491(a)(1) (granting jurisdiction to the Court of Federal Claims for any action against the government "upon any express or implied contract with the United States"). The Department points to the fact that each grant award takes the form of a contract between the recipient and the government. "But the mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have." Megapulse, Inc. v. Lewis, 672 F.2d 959, 968 (D.C. Cir. 1982). Here, although the terms and conditions of each individual grant award are at issue, the "essence," id., of the claims is not contractual. Rather, the States challenge the Department's actions as insufficiently explained, insufficiently reasoned, and otherwise contrary to

law -- arguments derived from the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A). The States' claims are, at their core, assertions that the Department acted in violation of federal law -- not its contracts. Simply put, if the Department breached any contract, it did so by violating the APA. And if the Department did not violate the APA, then it breached no contract. In the words of the Tenth Circuit, "when a party asserts that the government's breach of contract is contrary to federal regulations, statutes, or the Constitution, and when the party seeks relief other than money damages, the APA's waiver of sovereign immunity applies and the Tucker Act does not preclude a federal district court from taking jurisdiction." Normandy Apts., Ltd. v. HUD, 554 F.3d 1290, 1300 (10th Cir. 2009); see also Megapulse, 672 F.2d at 968, 970 (upholding a district court's jurisdiction where "[a]ppellant's position is ultimately based, not on breach of contract, but on an alleged governmental infringement of property rights and violation of the Trade Secrets Act").

Nor do the States seek damages owed on a contract or compensation for past wrongs. See Megapulse, 672 F.2d at 968-70 (considering, in a Tucker Act analysis, "the type of relief sought (or appropriate)"). Rather, they want the Department to once again make available already-appropriated federal funds for existing grant recipients. And as the Supreme Court has made

clear, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" Bowen v. Massachusetts, 487 U.S. 879, 893 (1988). As a result, we see no jurisdictional bar to the district court's TRO on this basis. See id. at 900-01 (holding that a district court could hear a claim for an injunction requiring the government to pay certain Medicaid reimbursements because it was "a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money," and "not a suit seeking money in compensation for the damage sustained by the failure of the Federal Government to pay"); Megapulse, 672 F.2d at 970-71 (explaining, in a Tucker Act case, that "the mere fact that an injunction would require the same governmental restraint that specific (non)performance might require in a contract setting is an insufficient basis to deny a district court the jurisdiction otherwise available").

## 2.

The Department also contends that these terminations are part of the "narrow[]" class of agency actions that are unreviewable in federal court. Dep't of Comm. v. New York, 588 U.S. 752, 772 (2019) (citation omitted); see 5 U.S.C. § 701(a)(2) (exempting from judicial review agency action "committed to agency discretion by law"); see, e.g., Lincoln v. Vigil, 508 U.S. 182, 185, 190-94 (1993) (labeling "unreviewable" the Indian Service's

decision to stop funding a program for handicapped children where Congress left the decision about how to "expend . . . money[] . . . for the benefit, care, and assistance of the Indians" up to the agency's discretion).

But here, applicable regulations cabin the Department's discretion as to when it can terminate existing grants. See 2 C.F.R. § 200.340(a) (2025) (enumerating four ways federal awards may be terminated); id. § 3474.1 (adopting § 200.340 for the Department of Education); see Pol'y & Rsch., LLC v. HHS, 313 F. Supp. 3d 62, 75-78 (D.D.C. 2018) (opinion of K.B. Jackson, J.) (holding that the agency's sudden and otherwise-presumptively unreviewable decision to halt funding to an agency program was reviewable under the APA because applicable regulations cabined its termination authority and therefore provided a standard by which the court could review the agency's decision). Nor are these regulations the only limits placed on the Department. The statutes establishing the TQP and SEED programs set forth the purposes of the grants, including, for example, the "recruit[ment] of highly qualified . . . minorities . . . into the teaching force," 20 U.S.C. § 1022(4), and the provision of "pathways [for teachers] to serve in traditionally underserved local educational agencies," id. § 6672(a)(1). So too has Congress instructed recipients to "provide assurances to the Secretary," including, for example, that participants "receive training in providing

instruction to diverse populations." Id. § 1022e(b).  Certainly, given these statutory mandates, the Department could not terminate a grant merely because a recipient program attempts to prepare participating school leaders to serve in traditionally underserved communities; nor could it treat assurances that a program provides training in the instruction of "diverse populations" as a reason to terminate an award.  These regulatory and statutory limits on the Department's discretion thus create "meaningful standard[s] by which to judge the [agency]'s action." Dep't of Comm., 588 U.S. at 772.

**B.**

We now turn to the core of the merits: a review of some of the Department's actions under the basics of administrative law as developed under the APA.  Like the district court, we focus our analysis on the States' arbitrary-and-capricious claim.  "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021).  This means that the agency's reasons "must be set forth with such clarity as to be understandable." SEC v. Chenery Corp. (Chenery II), 332 U.S. 194, 196 (1947).  And although judicial review of agency action is "narrow" in scope, we must still determine if the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection

between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quotation marks and citation omitted).

The Department challenges the district court's conclusion that its termination letters lacked reasoned explanation. But, as we have already described, the termination letters list up to five disjunctive reasons why the supposedly offending programs are now "inconsistent with . . . Department priorities." This leaves grant recipients, not to mention a reviewing court, to "guess at the theory underlying the agency's action." Chenery II, 332 U.S. at 196-97.

This lack of proper explanation from the Department likely "will not do," because "a court [cannot] be expected to chisel that which must be precise from what the agency has left vague and indecisive." Id. Adding to the uncertainty, the Department has yet to file what it claims to be an administrative record, even while seeking our expedited attention and equitable relief. See Fed. R. App. P. 17. And without a statement of the reason or reasons for the terminations, a court cannot say whether the Department properly considered all "relevant data." State Farm, 463 U.S. at 43. For example, it does not appear that the Department properly considered the reliance interests of grant recipients and program participants or that it accounted for all relevant impacts of cutting off funding to programs already in

- 11 -

place.  See DHS v. Regents of the Univ. of Cal., 591 U.S. 1, 30-
31 (2020) (holding the Department of Homeland Security's attempted
recission of the Deferred Action for Childhood Arrivals (DACA)
program arbitrary and capricious in part based on its failure to
consider recipients' reliance interests); State Farm, 463 U.S. at
43 (holding that an agency cannot "entirely fail[] to consider an
important aspect of the problem" before it).

Nor can we say that "the agency has [not] relied on
factors which Congress [did] not intend[] it to consider" in
disfavoring programs that feature DEI principles.  State Farm, 463
U.S. at 43; see, e.g., 20 U.S.C. § 1022(4) (stating a statutory
purpose of "recruit[ing] highly qualified individuals, including
minorities and individuals from other occupations, into the
teaching force"); id. § 1022e(b) (requiring grant recipients to
provide assurances that, among other things, "general education
teachers receive training in providing instruction to diverse
populations").

In its briefs to us and in an affidavit from its Chief
of Staff, the Department seeks to provide further
specificity -- stating that its actual reason for terminating the
grants was each program's use of those funds to teach DEI
principles.  But that supposed specificity is nowhere to be found
in the termination letters, which state in the disjunctive five
possible grounds for termination.  Indeed, this newfound claim of

clarity approaches the sort of "post hoc rationalization" that we cannot allow.  See Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 419-20 (1971) (holding that judicial review is inappropriate when it would rely on explanations found in the agency's litigation affidavits).

Finally, we are at this point not persuaded by the Department's contention that the district court was "incorrect" in rejecting the Department's attempts to invoke new priorities as grounds for the terminations.  See FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009).  For one, this argument fails to address Fox Television's directive that an agency must show "good reasons for the new policy" and account for "serious reliance interests" engendered by the old one.  Id.  Moreover, this argument entirely fails to rebut the States' credible assertions below that the Department's priorities must, per federal regulation, be established through formal rulemaking, which the Department did not do.  See 34 C.F.R. § 75.105(b) (2024).

The States claim other failings in the Department's termination of the ongoing grants.  For example, they argue that applicable regulations preclude the Department from terminating grants solely for failure to effectuate agency priorities, and therefore that the terminations were "not in accordance with law." 5 U.S.C. § 706(2)(A).  But given the apparent defects to which we point above, the outcome of this motion does not turn on the merits

of those additional arguments.  Moreover, we choose to say less rather than more precisely because the record and the parties' arguments are still developing in the district court.  The Department's insistence that we decide its motion with haste cautions against venturing further than is reasonably necessary to balance the parties' equitable positions while not yet being in a position to adjudicate finally the underlying dispute.

### c.

Advancing speculation and hyperbole, the Department asserts that it faces irreparable harm because the TRO allows grant recipients to request up to the entirety of their award monies and, indeed, creates the incentive for them to do so within the fourteen days the order is in effect -- with limited ability for the Department to recoup the funds should it prevail on the merits. The States convincingly explain that this is simply not the case, in part because recipients submit reimbursement requests for expenses already incurred.  And, in fact, the Department has not pointed to any evidence of any attempt at any such a withdrawal by any recipient.  Nor does the Department rebut the contention that it could stop such an attempted withdrawal.

Of course, the district court's order does require the Department to continue making payments that would otherwise be due but for the terminations.  As a result, some smaller, incremental disbursements will no doubt occur while the TRO is in effect.

Hence, the Department may incur some irreparable harm if it cannot recoup this money. But the Department has not yet shown that recoupment is implausible. See Nken, 556 U.S. at 434-35 ("[S]imply showing some possibility of irreparable injury fails to satisfy the second factor." (cleaned up)); Common Cause R.I. v. Gorbea, 970 F.3d 11, 15 (1st Cir. 2020) (per curiam) (noting that claims of irreparable harm must not only be "correct as a matter of theory" but also "as a matter of fact and reality"). And, at bottom, the funds will go to programs Congress intended to fund -- in amounts that in total do not exceed Congress's direction -- consistent with priorities previously published by the Department in accordance with applicable regulations. See, e.g., Final Priorities -- Effective Educator Development Division, 86 Fed. Reg. 36217 (July 9, 2021).

In short, any irreparable harm arguably caused by the TRO is not of a type and magnitude that grabs equities' emergency attention when compared to the harm that the recipients could well suffer if the TRO is stayed. The States provided detailed evidence below of the practical impacts of cutting off grants -- some which have already begun to occur and which cannot be fully remedied with late-arriving funds -- including staff layoffs, program disruptions, and the halting of stipends to currently enrolled teachers. The States also described below how these immediate effects will weaken the very teacher pipelines in their

jurisdictions that Congress intended to strengthen through the TQP and SEED programs. The Department provides no compelling rebuttal and therefore does not convince us that the second or third <u>Nken</u> factors tip in favor of a stay. <u>See</u> 556 U.S. at 426.

Additionally, given our conclusions about the Department's failure to show a likelihood of success on the merits, its assertion that the public interest aligns with its interests in a stay are unavailing. <u>See</u> <u>League of Women Voters of U.S.</u> v. <u>Newby</u>, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." (quotation marks and citation omitted)).

**D.**

Lastly, the Department claims that the TRO is overbroad for two reasons. First, the Department calls attention to the fact that the TRO applies to several grant recipients "that are located within the [] States but that are only 'affiliated with' the State or that are local school districts rather than clearly State instrumentalities." The district court did not, according to the Department, "meaningfully explain its understanding that each recipient is in fact an instrumentality of a plaintiff." But the parties have not yet briefed the relationship between the States, their school districts, and nonprofit entities "affiliated" with the States. Given that a hearing on a motion

for an actual preliminary injunction is scheduled to be held shortly, we think it premature to address the adequacy of the district court's explanation on this point now.

Second, the Department contends that the TRO does not allow the Department to reinstate the terminations if and when the Department corrects the deficiencies upon which the district court justified the TRO. But the Department does not claim that it plans to take any such corrective action before the hearing on the States' motion for a preliminary injunction, at which point the district court will consider validly raised arguments by all parties that it has not yet addressed. We therefore see no need to address this issue now.

### III.

For the foregoing reasons, the motion for a stay pending appeal is **denied**. An expedited briefing schedule on the Department's appeal will be set by the clerk forthwith.